*IN ERROR.*
••••••
ALBANY,
March, 1808.

Sands
and others
v.
Codwise
and others.

COMFORT SANDS, HENRY SANDS, LEWIS ⎱ *Appellants,*
   SANDS, NATHANIEL PRIME and others, ⎰

*against*

GEORGE CODWISE, jun. PETER LUDLOW, ⎫
  JAMES CODWISE, ROBERT MORRIS, ⎪
  JAMES LUDLUM, JONATHAN OGDEN, ⎬*Respondents.*
  ISAAC COCK, ALLEN CLAPP, JACOB ⎪
  VALENTINE, and MICHAEL MERRIT, ⎭

What acts and circumstances of fraud, will avoid conveyances, as against creditors.

Conveyances made to defeat creditors, are void by common law as well as by the statute of frauds.

Where deeds are void, on the ground of absolute fraud, they are to be considered as void *ab initio,* and are not allowed to stand as security to the grantee, for advances he may have made, or responsibilities he may have entered into, on account of them.

Where the grantor of a deed, made to defeat creditors, afterwards becomes a bankrupt, the grantee is accountable for the rents and profits, subsequent to the act of bankruptcy, or from the time when the right of the creditors to call him to account accrued, and not before.

THE respondents filed their bill in the court of chancery, as creditors of the appellant, *Comfort Sands,* for themselves, and all the other creditors of *Comfort Sands,* who should be adjudged entitled so to do, and who should come in and contribute to the expenses of the suit, or any other proceedings which might be directed, or take place, in consequence of such suit, against the appellants, and others, made defendants.

The appellant, *Comfort Sands,* for many years, prior to the year 1797, was extensively concerned in business, as a merchant, and was reputed to be a person of large estate. About the year 1797, he became indebted to the respondents, in the sums of money, mentioned in their bill, and which remain unpaid. In the year 1797, and after, being indebted to the respondents, he became embarrassed in his affairs, stopped payment, and pretended to be unable to pay his debts, but did not exhibit to his creditors a statement of his affairs.

At the time he stopped payment, he was possessed of a large personal estate, and a large and valuable real

Where a bill in chancery was filed by creditors, to set aside the deeds of a bankrupt, on the ground of fraud, it was held, that the property was not to be placed in the hands of a master, but was to be disposed of by the *assignees* of the bankrupt, according to the bankrupt law of the *United States.*

On an appeal, this court will decide on those parts only of the decree of the court below, which are complained of in the petition of appeal.

IN ERROR.
••••••
ALBANY,
March, 1808.

Sands and
others
v.
Codwise and
others.

estate ; part of which was situated in the city of *New-York* ; part in *Brooklyn*, in *King's* county ; part at *Schaticoke*, in *Rensselaer* county ; part in *Minisink*, in *Orange* county ; some in the city of *Washington*, in the territory of the *United States*, besides lands in the state of *Georgia*, and elsewhere.

When he stopped payment, *H.* and *S. Johnson* were indorsors on his notes, for his accommodation ; and on a settlement of accounts, in *February*, 1798, there was a balance due from him to the said *H.* and *S. Johnson*, of 12,634 dollars and 11 cents, of which he paid them, soon after, 800 dollars ; and they still remained indorsors on a note, remaining in the bank of *New-York*, for 2,500 dollars, which added to the balance of account, made the sum of 14,334 dollars and 11 cents ; for which sum he voluntarily gave to them, a bond, and warrant of attorney, on which judgment was entered up against him, in *July*, 1798, and was the first judgment against him. A *fieri facias* was soon after issued on the said judgment, which was levied on the houshold furniture, and other personal property of *Comfort Sands*, and on his dwelling-house in *Pine-street*, and another dwelling-house in *Cedar-street*. In *November*, 1798, the sheriff sold the personal property taken on the execution, at public auction, to the appellant, *Nathaniel Prime*, the son-in-law of the said *Comfort Sands*, as the highest bidder, for 1,371 dollars and 37 cents, being less than its real value. *Prime*, with the consent of the plaintiffs named in the execution, gave his note for the amount ; but whether he afterwards paid it, did not appear. He left the property in the possession of *Comfort Sands*, who had the use of it, until his bankruptcy.

The houses in *Pine* and *Cedar-streets* were also exposed to sale by the sheriff, and were struck off to *John Swartwout*, as the highest bidder, for 11,000 dollars ; and *H.* and *S. Johnson* agreed to receive in payment

IN ERROR.
•••••••
ALBANY,
March, 1808.

Sands and
others
v.
Codwise and
others.

from the purchaser, their own notes, originally given to *Melancton Smith*, and which had come into the hands of *Comfort Sands*, amounting to 9,116 dollars and 25 cents, and a note, indorsed by them and *Francis Wainwright*, for 2,500 dollars. These notes were obtained by *Comfort Sands*, and delivered to *Swartwout*, who delivered them to *H.* and *S. Johnson*, who thereupon directed the sheriff to make a conveyance of the property to *Swartwout*, who was bail for *Comfort Sands*, and his surety on bonds at the custom-house. In *January*, 1801, *Comfort Sands* having exonerated *Swartwout*, from his responsibilities for him, the latter agreed to convey the houses in *Pine* and *Cedar-streets*, to any person the former might appoint. In *April*, 1801, he conveyed the same houses, to *Lewis Sands*, a son of *Comfort Sands*, (who in his answer, stated he received his note for 11,000 dollars,) subject to a mortgage to *Samuel Jones*, and *John Haring*, for 2,312 dollars. In *July*, 1801, *Comfort Sands* moved into the house in *Pine-street*, and occupied it for some time afterwards. The houses and lots, in *Pine* and *Cedar-streets*, are stated to have cost, in 1794, and 1795, 13,750 dollars.

In *July*, 1798, *Comfort Sands* mortgaged his estate in *Brooklyn*, to the bank of *New-York*, to secure the payment of 50,000 dollars, with interest; and the value of the property was alleged in the bill, to be 100,000 dollars. Afterwards, in *July*, 1798, he conveyed the same property to his son, *Henry Sands*, for the consideration of 60,000 dollars, of which he was to pay 56,000 to the bank of *New-York*, which included what was due, and one year's interest in advance; and the remaining 4,000 dollars, was to be paid to *Comfort Sands*. Notwithstanding the sale, *Comfort Sands* continued to exercise acts of ownership over the property; speaking of it as his own, making verbal leases of some parts, and written leases of other parts, paying the taxes and offering parts of

it for sale, and actually selling portions of the property to several persons.

IN ERROR.
........
ALBANY,
March, 1808.

Sands and
others
v.
Codwise and
others.

In *July*, 1798, *Comfort Sands* conveyed all his lands in *Schaticoke* to his son, *Henry Sands*, for the consideration of 8,020 dollars ; and in *September*, 1800, he conveyed to the same son, all his real estate in *Minisink*, for the consideration of 8,125 dollars, of which, 7,125 dollars, was to be paid to one *Clayton*, on account of a debt due to him from *Comfort Sands*, and 1,000 to the appellant himself, as he stated in his answer.

In *November*, 1800, *Comfort Sands* conveyed to his son, *Lewis Sands*, all his real estate in the city of *Washington*, for the consideration of 9,000 dollars. At the time of his stopping payment, *Comfort Sands* also had a claim against the *United States*, for a large sum of money, the amount of which had been previously settled by arbitrators ; and which he assigned to *Nathaniel Prime*, for the sum of 5 dollars, in trust, to pay certain creditors.

*Comfort Sands* was possessed of real estate in *James-street*, in the city of *New-York*, which was mortgaged to the bank of *New-York*; and on the 5th *September*, 1800, having paid the sum for which it was pledged, the bank, by his direction, conveyed the estate to *Robert Sands*, his brother, who, as was alleged in the bill, did not pay *Comfort Sands* any thing, for the property ; but held it in trust for *Comfort Sands*, who continued to receive the rents and profits.

In the year 1796, *C. Sands* was owner of three lots of ground, in *Greenwich-street ;* one of which, he conveyed to each of his three daughters, *Cornelia, Frances,* and *Sarah Maria*, for the consideration of five shillings, for their advancement, and better provision in life. *Sarah Maria* died in 1802, and her father received the rents and profits of the lot.

IN ERROR.
•••••••
ALBANY,
March, 1808.

Sands and
others
v.
Codwise and
others.

*Joseph Sands*, the eldest son of *Comfort Sands*, went to *Europe*, in 1790, where he transacted business for his father, as his agent; and settled a claim on the government of *France*, for 150,840 livres, which was registered in the name of *Joseph Sands*, out of which he was directed to pay certain debts of *Comfort Sands;* but whether he paid such debts, or what became of the fund did not appear.

*Comfort Sands* refusing to pay his creditors, or to give them a satisfactory account of his affairs, was sued; and in *August*, 1798, was taken in execution, and imprisoned in *King's* county, where he continued until *July*, 1801. A *capias ad respondendum* having been issued against him, in *January*, 1801, on which he was arrested, and having continued in custody, under the arrest, for more than two months, without giving bail, a commission of bankruptcy was issued against him, on the 22d *June*, 1801, on which he was declared a bankrupt.

*Isaac Kibbe* having been chosen an assignee, all the real and personal estate of the bankrupt, was assigned to him, on the 18th *July*, 1801 ; and the respondents proved their debts under the commission. In a letter written by *Comfort Sands* to a mercantile house in *England*, who were his creditors, two days after the commission of bankruptcy issued, he says ; " That the proceedings of some of his ill-natured creditors, had brought him to a determination of being made a bankrupt; and that he had then arranged with all his friendly creditors, and had only his hostile ones to contend with, who would suffer for their conduct,. and not get 5 *per cent.* for their demands ;" and he admitted, that he intended to become a bankrupt, in the beginning of *June*, 1801.

On his examination before the commissioners, he did not admit that he was possessed of any real or personal estate, at the time of his becoming a bankrupt, except his claim on the *French* government, liquidated in the

name of *Joseph Sands*, his son and agent, of which he
had made some previous appropriations ; and some out-
standing debts and claims of little value.

The bill of the respondents charged, that the convey-
ances to the sons and brother of *Comfort Sands*, above
mentioned, were made with intent to defraud his credit-
ors ; that *Lewis Sands* and *Henry Sands* were young
men, possessed of little or no property, and dependent
on their father ; that the sums mentioned in the deeds,
were nominal and inadequate, and were never paid by
them, or if they gave notes or securities, they were
merely colourable, and afterwards given up, or changed,
so as to suit the fraudulent intent of *Comfort Sands*, and
the property held as in trust, for him, or his particular
friends ; that after the conveyances were made, he ex-
ercised various acts of ownership over the estates ; and
that he declared, on his examination before the commis-
sioners of bankruptcy, that he considered the estates in
the hands of his sons, as funds for the payment of such
debts as he chose to pay ; and that he had made arrange-
ments to have them applied accordingly ; that these
arrangements were made, wholly, or in part, by obtain-
ing from his sons and friends, promissory notes, payable
to himself, at distant periods ; and which he indorsed
and delivered to certain creditors, to be held by them,
and to be paid out of the sales of the property, so con-
veyed and assigned ; that some of these notes, to
the amount of 5 or 6,000 dollars, were placed in the
hands of *John Blagge*, upon a pretended trust, for cer-
tain creditors of *Comfort Sands*, with whom *Blagge* was
wholly unacquainted, and from whom he had no authori-
ty to accept the notes ; that *Isaac Kibbe*, the assignee,
was chosen by a majority of the creditors of *Sands*, and
against the wishes of the respondents ; and in *August*,
1801, the respondents applied to *Kibbe*, for permission to

*IN ERROR.*

ALBANY,
March, 1808.

Sands and
others
v.
Codwise and
others.

Sands and
others
v.
Codwise and
others.

use his name, in such proceedings at law, or in equity, as should be necessary for the creditors of *Sands* to obtain justice, and to have the property which had been fraudulently conveyed, or concealed, applied to the payment of his debts : and they offered, in case *Kibbe* would consent, to indemnify him against all costs and expenses ; but he declined doing any thing therein, and took no steps to get possession of the property so conveyed. The bill sought a discovery from *Comfort Sands* of his affairs ; and prayed that the property conveyed, assigned, or delivered to others, might be applied to the payment of the debts due to the respondents, and such other creditors as should come in and contribute, and be decreed entitled to participate with the complainants, and particular relief as to the other defendants, &c. An injunction was issued to prevent the appellants, and *Robert Sands*, from conveying or disposing of the property, monies, or securities which had belonged to *Comfort Sands*, and in their hands, or under their control, until the further order of the court.

*Comfort Sands*, in his *answer*, in the court below, denied that the conveyances above mentioned, were made to defraud his creditors, or that any trust was expressed or understood for him, or that he had any design to secure the property to himself or his family ; he alleged that he acted as an agent for his son *Henry*, in relation to the *Brooklyn* estate ; that his object in the sale of his property, was to apply it to the payment of his debts ; and that he expected his son *Henry* would have been able to dispose of the property (with some benefit to himself) for the notes of *Comfort Sands;* that the security he took from his sons was personal, but *bona fide ;* that he believed his sons would have been fully able to pay the notes, out of the property sold by them, as the notes were payable at different periods, so as to afford time for sales, without any sacrifice ; but that the sales had been prevented

IN ERROR.

ALBANY,
March, 1806.

Sands and
others
v.
Codwise and
others.

by the injunction obtained by the respondents; that some of the notes had been paid, but the greatest part still remained unpaid; and that a further reason for his making the conveyances absolute, without any other security for the purchase-money, was to avoid having the property sacrificed at auction, under a sheriff's sale, for the benefit of particular creditors; that at the time he paid the notes to his creditors, he had no intention of becoming a bankrupt. He also denied all collusion with his assignee, to prevent any suits being brought against him, or any knowledge of what passed between the respondents and *Kibbe*; he alleged that the property in *James-street* was conveyed to his brother *Robert*, in trust, to pay two notes, one to *John Jackson*, and the other to *David Smith & Co.* and that the property was conveyed to *John Jackson* absolutely, without any trust whatever, and the notes taken up; that he gave a full account of the disposition he had made of his property, before the commissioners; he denied that the commission of bankruptcy was taken out collusively, and insisted on the benefit of his discharge under the bankrupt law.

Most of the other defendants answered, or disclaimed; and the bill was taken *pro confesso*, against the rest.

Much testimony was taken in the cause, and many exhibits were read at the hearing; but it is unnecessary to swell the case, by a detail of them, as the material facts, not above stated, are mentioned in the opinions of the court.

The cause was brought to a hearing, before the chancellor, in *March*, 1805, and on the 17th *February*, 1806, he pronounced the following decree:

" That the dwelling-house situate adjoining *Pine-street*, in the city of *New-York*, with the ground thereunto belonging, or therewith used, mentioned in the pleadings of this cause, and also the dwelling-house in the

IN ERROR.

ALBANY,
March, 1808.

Sands and
others
v.
Codwise and
others.

rear of the before-mentioned dwelling-house, and situate adjoining *Cedar-street*, in the said city, with the ground thereunto belonging, or therewith used, also mentioned in the pleadings of this cause, be respectively sold, by one of the masters of this court, at public auction, in the city of *New-York*, after giving at least *six weeks notice* of the time and place of such sale, in two or more of the public newspapers, printed in the city of *New-York ;* and that out of the proceeds of the said sales, the said master pay *Samuel Jones* and *John Haring*, two of the defendants in this cause, the amount due to them on the mortgage, executed to them by the defendant, *Joseph Sands*, which mortgage is mentioned in the pleadings in this cause, together with their costs, to be taxed ; the amount so due, on the said mortgage, to be ascertained by the said master, who shall sell the said premises, which, together with the amount of such taxed costs, the said master is to report to the court, with all convenient speed ; And that the said master bring into court, the surplus money, arising from such sales, to be distributed among the creditors of the said *Comfort Sands*, as shall be hereafter directed : And further, that the defendant *Lewis Sands* join with the said master, in the conveyances to be made of the said premises to the purchasers thereof, in fee-simple ; and that the defendants, *Comfort Sands*, and *Lewis Sands*, or one of them, deliver to the said master, the deed from the former sheriff of the city of *New-York* to *John Swartwout*, and the deed from the said *John Swartwout* to the said *Lewis Sands*, for the said houses and grounds so ordered to be sold, which are mentioned in the pleadings, or proofs in this cause ; and that they, the said *Comfort Sands*, and *Lewis Sands*, at the same time, and under oath, to be administered by the said master, if he thinks proper to administer the same, deliver unto the said master, all the deeds, conveyances or assurances, in their or either of their hands, or

power, relating to the said premises, or any part thereof, and that the said master deposit the said deeds, conveyances and assurances, in the office of the assistant register of this court, in the city of *New-York*, to wait the further order of this court touching the same. And that the said *Samuel Jones*, and *John Haring*, upon receiving the amount due to them on the said mortgage, with their costs to be taxed as aforeaid, shall either assign the said mortgage to attend the inheritance, or cause the registry thereof to be cancelled, as the purchasers of the said premises shall elect : And it is further ordered, adjudged, and decreed, that the defendant, *Lewis Sands*, account before the said master, who shall sell the bforeementioned premises, for the rents and profits of the beforementioned houses and grounds, from the twenty-seventh day of *April*, in the year of our Lord, one thousand eight hundred and one, (being the day when, according to his answer, and the proofs in the cause, he received a conveyance thereof from *John Swartwout*,) to the time the master shall sell the same, as herein-before directed : and that in stating such account, the master make an allowance for all necessary repairs and improvements, permanently useful ; and that in such account, the said *Lewis Sands* be charged by the master with the clear annual value of the said premises ; and if, on inquiry, it shall appear to the said master, that the said *Lewis Sands* shall not, in fact, have received the rents and profits of the said premises, from the said *Comfort Sands*, for the whole, or some part of the period, last aforesaid, the said *Comfort Sands* shall account for the said rents and profits, for such period as he has not paid the same to the said *Lewis Sands*, according to the aforesaid directions ; and that the said master have power to examine the said *Lewis Sands* and *Comfort Sands*, on oath, in relation to said accounting, if he shall deem it proper ; and it is in like manner ordered.

*IN ERROR.*

ALBANY,
March, 1808.

Sands and others
v.
Codwise and others.

IN ERROR.

ALBANY,
March, 1808.

Sands and
others
v.
Codwise and
others.

adjudged, and decreed, that the defendant *Henry Sands*, shall convey to *Thomas Cooper*, one of the masters of this court, by a competent deed or instrument in the law, to be devised and settled by the said master, all and singular, the lands, tenements and hereditaments, and real estate, situate at *Brooklyn*, in *King's* county, which were conveyed to the said *Henry Sands*, by the defendant *Comfort Sands*, by the deed or conveyance, mentioned in the pleadings of this cause, bearing date, on or about the ninth day of *July*, in the year of our Lord one thousand seven hundred and ninety-eight, excepting such parts of the said lands, tenements, or real estate, as the said defendant *Henry Sands* conveyed unto the said defendant *Comfort Sands*, by a deed or conveyance, bearing date on or about the fifteenth day of *September*, in the year of our Lord one thousand eight hundred and one, and which appeared in proof at the hearing of this cause ; and excepting also such other parts or portions of the said lands, tenements, hereditaments and real estate, as may have been heretofore, and since the said conveyance from the said *Comfort Sands* to the said *Henry Sands*, sold and conveyed by the said *Henry Sands* to any other person or persons *bona fide*, and for valuable consideration, before the thirteenth day of *November*, in the year of our Lord one thousand eight hundred and one, the day on which the bill in this cause was filed ; and excepting further, such parts or portions of the said premises, as have been or may be hereafter and before such conveyance from the said *Henry Sands* to the master shall be executed, sold under the decretal order of this court, to satisfy the mortgage on the said premises, given by the said *Comfort Sands*, and held by the president, directors, and company of the bank of *New-York*; such conveyance from the said *Henry Sands* to the master as is hereby intended and directed, is to embrace all that part of the said real estate and premises,

which, on a partition between the defendant *Henry Sands* and *Joshua Sands*, fell or was assigned to the said *Henry Sands*, as the grantee of the said *Comfort Sands*, as in the pleadings mentioned; and to the end that it may be known how much and what parts or portions of the said real estate, situate at *Brooklyn*, and mentioned in the pleadings in this cause, are to be thus conveyed by the said *Henry Sands*, to the master, in conformity to this order and decree; the said *Henry Sands* shall state to the said master, upon oath, if required, the particular parts or portions of the said lands, tenements and hereditaments which have been conveyed by him the said *Henry Sands*, which are embraced or fall within the second exception before expressed; and the person or persons to whom such conveyance or conveyances was or were made, and the time or times when, and the consideration for each lot or parcel so conveyed, and whether the consideration monies have been paid, and if not, when payable and how secured : And it is further ordered, adjudged and decreed, that the defendant *Henry Sands*, before, or at the time of executing such conveyance to the master, as is hereby directed, of the said lands, tenements and hereditaments, situate at *Brooklyn*, shall deliver unto the said master the said deed from the said *Comfort Sands* to the said *Henry Sands*, dated on or about the ninth day of *July*, in the year of our Lord one thousand seven hundred and ninety-eight, in the pleadings mentioned, and also the deed or instrument of the partition made of the real estate situate at *Brooklyn*, between the said defendant *Henry Sands*, as grantee of the said *Comfort Sands*, and *Joshua Sands*, in the pleadings in this cause mentioned; and also all other deeds, conveyances or evidences of title, and all leases made thereof, or any part or parts thereof, and also all maps of the said lands, tenements or hereditaments, situate at *Brooklyn*, in the hands, possession, or

IN ERROR.
........
ALBANY,
March, 1803

Sands and others
v.
Codwise and others.

IN ERROR.
......
ALBANY,
March, 1808.

Sands and
others
v.
Codwise and
others.

power of the said *Henry Sands;* and that the said master have power to examine the said *Henry Sands*, on oath, if he thinks proper, touching such deeds or other evidences of title as are hereby directed to be delivered by him the said *Henry Sands* to the said master : And it is further ordered, adjudged and decreed, that the defendant *Henry Sands* account before the said master on oath, for the proceeds of the sales of every part of the said lands, tenements and hereditaments, situate at *Brooklyn* aforesaid, which were conveyed to him by the said *Comfort Sands*, by the deed or conveyance mentioned in the pleadings in this cause, bearing date on or about the ninth day of *July*, in the year of our Lord one thousand seven hundred and ninety-eight, excepting so much thereof as has already or may hereafter be sold, under the decretal order of this court to satisfy the mortgage on the same premises, held by the president, directors, and company of the bank of *New-York*, and excepting also so much thereof as the said *Henry Sands* reconveyed to the defendant *Comfort Sands* by the aforesaid deed, bearing date on or about the fifteenth day of *September*, in the year of our Lord one thousand eight hundred and one, or such part of the last-mentioned portion as the said *Comfort Sands* shall actually convey to the master as hereafter directed ; that in such account the said *Henry Sands* be charged with all the said real estate, or such parts thereof as have been sold or conveyed, between the said ninth day of *July*, in the year of our Lord one thousand seven hundred and ninety-eight, and the thirteenth day of *November*, in the year of our Lord one thousand eight hundred and one, according to the real and true value of the property, at the times of selling and conveying the same ; and also that the said *Henry Sands* account, on oath, if required, for the rents and profits of all the said real estate conveyed to him by the said *Comfort Sands* as aforesaid, from the said

IN ERROR.

ALBANY,
March, 1808.

Sands and
others
v.
Codwise and
others.

ninth day of *July*, in the year of our Lord one thousand seven hundred and ninety-eight, in which account the said *Henry Sands* shall be charged with the clear annual income of the said lands, tenements and hereditaments; but with respect to those parts of the said real estate, which have been or may be sold by virtue of a decretal order of this court, to satisfy the said mortgage held by the president, directors and company of the bank of *New-York*, the account of rents and profits is to be taken only till the times of such sales respectively; and the said master, in taking the said accounts, shall allow the said *Henry Sands*, by way of discharge, all such sums as may have been applied by the said *Henry Sands* towards discharging the said mortgage to the president, directors and company of the bank of *New-York*, or the payment of other *bona fide* debts contracted by the said *Comfort Sands*, and which were due from him, and actually paid by the said *Henry Sands* out of the said sales, or out of the said rents and profits, on or before the fourth day of *April*, in the year of our Lord one thousand eight hundred; and for all necessary repairs and improvements permanently beneficial: And it is further ordered, that the said master report the result of the said accounting by the said *Henry Sands*, to this court with all convenient speed: And it is further ordered, adjudged and decreed, that the defendant *Comfort Sands* convey to the aforesaid master, by a competent deed for that purpose, to be settled by him, all and singular, that part of the said real estate situate at *Brooklyn*, mentioned in the pleadings in this cause, which was conveyed by the defendant *Henry Sands* to the said *Comfort Sands*, by a deed bearing date on or about the fifteenth day of *September*, in the year of our Lord one thousand eight hundred and one, which appeared in the proofs in this cause, excepting however so much of the said last-mentioned premises, as the said *Comfort Sands*

IN ERROR.
•••••••
ALBANY,
March, 1808.

Sands and
others
v.
Codwise and
others.

shall have *bona fide* sold and conveyed to any person or persons, previous to the thirteenth day of *November*, in the year of our Lord one thousand eight hundred and one, which sales and conveyances are to be ascertained by the said master, and touching which he may examine the said *Comfort Sands* on oath, if he thinks proper; and further, that the said *Comfort Sands*, at the time, or before he makes the said last-mentioned conveyance, shall deliver to the said master the said deed from the said *Henry Sands* to him, bearing date on the said fifteenth day of *September*, in the year of our Lord one thousand eight hundred and one, and all other deeds or evidences of title relating to the said last-mentioned premises, and all leases of the same or any part thereof, and all maps of or relating thereto, which are in the possession, power, or under the control of the said *Comfort Sands;* and this under the oath of the said *Comfort Sands*, if the said master shall think proper : And it is further ordered, adjudged, and decreed, that the said defendant *Comfort Sands*, account before the said master for all monies arising from the sales, conveyances and dispositions of the said lands, tenements and hereditaments, situate at *Brooklyn*, and conveyed by him to the defendant *Henry Sands*, as mentioned in the pleadings in this cause, and which have been sold, conveyed or disposed of by the said *Comfort Sands*, after the said ninth day of *July*, in the year of our Lord one thousand seven hundred and ninety-eight, and before the said thirteenth day of *November*, in the year of our Lord one thousand eight hundred and one, or the proceeds whereof have been received or disposed of by the said *Comfort Sands*, or to his use ; and that in that account the said *Comfort Sands* be charged with the real and true value of the said premises, sold, conveyed or disposed of as aforesaid : And that the said master also have power to examine the said *Comfort Sands* on oath, touching the said last-mentioned

IN ERROR.
•••••••
ALBANY,
March, 1808.

Sands and
others
v.
Codwise and
others.

account, if he thinks proper: And it is further ordered, adjudged, and decreed, that the said *Comfort Sands* account before the said master for the rents and profits of all and singular the said lands, tenements and hereditaments, situate at *Brooklyn*, and which were conveyed by the said *Comfort Sands* to the defendant *Henry Sands*, by the aforesaid deed, bearing date on or about the ninth day of *July*, in the year of our Lord one thousand seven hundred and ninety-eight, which have been received by or to the use of the said *Comfort Sands;* and also for the rents and profits of the said real estate, or so much thereof as may have been leased out by, or has been in the possession of the said *Comfort Sands* since the day of the date of the said conveyance to the said *Henry Sands;* in which account the said *Comfort Sands* is to be charged with the clear annual income of the said premises, to be ascertained by the said master, and to be allowed for all necessary repairs, and for improvements permanently beneficial; and that the said master have power to examine the said *Comfort Sands* upon oath, touching the account for the rents and profits last aforesaid: And it is further ordered, adjudged, and decreed, that the said master shall forthwith, after obtaining the same, file in the office of the assistant register of this court, in the city of *New-York*, all deeds, conveyances, and evidences of title, and maps of the said lands, tenements and hereditaments, situate at *Brooklyn*, which shall be delivered to him by the said *Henry Sands* and *Comfort Sands*, in pursuance of the directions hereby given for that purpose, with a schedule describing the same, there to await the further order of this court; and that the said master report to this court with all convenient speed the accounts of the said *Henry Sands* and *Comfort Sands*, herein before directed to be taken: And it is further ordered, adjudged, and decreed, that the said master receive from the said defendants *Henry Sands* and *Com-*

IN ERROR.
•••••••
ALBANY,
March, 1808.

Sands and
others
v.
Codwise and
others.

*fort Sands*, the conveyances of the said lands, tenements and real estate, situate at *Brooklyn*, herein before directed to be made in trust, to be sold; and that the said master sell the same at public auction in the city of *New-York*, in such parcels or portions, as he may think proper; giving at least *eight weeks* notice of the time and place of each sale; and that the said master, together with the defendants *Comfort Sands* and *Henry Sands*, and all other proper parties, to be ascertained by the said master, convey the said premises to the purchasers thereof in fee-simple; that the said master bring the money arising from the said sales into this court, to be distributed among the creditors of the said *Comfort Sands* as shall be hereafter directed: And it is further ordered, adjudged and decreed, that the slaves, household furniture, and other personal property which belonged to the defendant *Comfort Sands*, and which were sold by the sheriff of the city and county of *New-York*, under an execution, and purchased by the defendant *Nathaniel Prime*, and by him left in the possession of the said *Comfort Sands*, as in the pleadings in this cause mentioned, be delivered to the said master, and by him sold at public auction, first giving public notice of the time and place of such sale; and that the said master bring the proceeds of the said last-mentioned sales into this court, to be distributed among the creditors of the said *Comfort Sands*, as shall be hereafter directed; and that the said *Nathaniel Prime* and *Comfort Sands* inform the said master upon oath, of the particulars of the said slaves, household furniture, and personal property, so purchased at the sheriff's sales by the said *Nathaniel Prime*; and if the same or any part thereof shall not be delivered to the said master in pursuance of this order, by reason of having been since sold *bona fide* to any third person, or by reason of having been worn out, consumed or destroyed, that the said *Comfort Sands* account before

IN ERROR.
......
ALBANY,
March, 1808.

Sands and
others
v.
Codwise and
others.

the said master for the value thereof, or so much thereof as shall not be delivered to the said master for the reasons aforesaid; and that the said master report to this court the amount of the said sales, and of the account last directed: And it is further ordered, adjudged, and decreed, that it be referred to one of the masters of this court to ascertain and report to this court, whether any, and what parts or portions of the said real estates, situate at *Minisink* and *Schacticoke*, mentioned in the pleadings in this cause, have been conveyed by the said *Henry Sands*, before the fourth day of *April*, in the year of our Lord one thousand eight hundred, to the *bona fide* creditors of the said *Comfort Sands*, in satisfaction or towards satisfaction of the said creditors' demands; and when, and to whom, and whether any, and what parts or portions of the said last-mentioned real estates have been sold or conveyed, or agreed to be conveyed by the said *Henry Sands*, either after the said fourth day of *April*, in the year of our Lord one thousand eight hundred, or to persons *bona fide* creditors of the said *Comfort Sands*, and in satisfaction or towards satisfaction of their demands; and when, and to whom, and for what considerations, and whether such consideration money has been paid, and when and to whom, and if not paid, then whether secured to be paid, and by whom, and to whom, and in what manner; and also to inquire whether the title to any, and what parts or portions of the said last-mentioned real estates remain in the said *Henry Sands* or *Comfort Sands*, and how much in particular, and the value thereof, and that the said master have power to examine the said *Henry Sands* and *Comfort Sands* on oath, touching the premises hereby last referred to him, and that he report thereon to this court with all convenient speed: And it is further ordered, adjudged, and decreed, that it be referred to one of the masters of this court to ascertain and report to this court, whether

*IN ERROR.*
•••••••
ALBANY,
March, 1808.

Sands and
others
v.
Codwise and
others.

any, and what parts or portions of the said real estates situate at *Washington*, in the territory of the *United States*, mentioned in the pleadings in this cause, have been conveyed by the said *Lewis Sands*, before the fourth day of *April*, in the year of our Lord one thousand eight hundred, to the *bona fide* creditors of the said *Comfort Sands*, in satisfaction, or towards satisfaction of the said creditors' demands ; and when, and to whom, and whether any, and what parts or portions of the said real estates have been sold or conveyed, or agreed to be conveyed by the said *Lewis Sands*, either after the said fourth day of *April*, in the year of our Lord one thousand eight hundred, or to persons not *bona fide* creditors of the said *Comfort Sands*, and in satisfaction, or towards satisfaction of their demands ; and when, and to whom, and for what consideration, and whether such consideration money has been paid, and when, and to whom, and if not paid whether secured to be paid, and by whom, and to whom, and in what manner ; and also to inquire whether the title to any, and what parts or portions of the said last-mentioned real estates remain in the said *Lewis Sands* or *Comfort Sands*, and how much in particular and the value thereof ; and that the said master have power to examine the said *Lewis Sands* and *Comfort Sands*, on oath, touching the premises hereby last referred to him, and that he report thereon to this court with all convenient speed : And it is further ordered, that a feigned issue or issues be made up in the supreme court of this state, to be tried by a jury in the city and county of *New-York*, at any sittings or circuit court there, to be hereafter held, to ascertain by the verdict of such jury, when the indenture or deed bearing date on the thirteenth day of *November*, in the year of our Lord one thousand seven hundred and ninety-six, mentioned in the pleadings in this cause to have been given by the defendant *Comfort Sands*, to his daughter

IN ERROR.
•••••••
ALBANY,
March, 1808.

Sands and
others
v.
Codwise and
others.

*Sarah Maria Sands*, for a lot of ground adjoining *Green-wich-street*, in the city of *New-York*, was executed; and whether the said *Comfort Sands* had not the said deed in his custody or power after the execution thereof; and whether the said *Comfort Sands* did not receive the rents and profits, or exercise other acts of ownership over the said lot of ground, after the date of the said deed; and whether the said *Comfort Sands* was not, at the time of executing and delivering the said deed, largely indebted; and that the parties respectively be at liberty to read and offer in evidence, on the trial of the said issues, the pleadings and proofs in this cause; and to offer also on the said trial any other or further evidence: And it is further ordered, that the complainants in this cause have their option either to make up and carry down the said issues to trial, or that their bill as to the said lot of ground be dismissed: And it is further ordered, that all further directions be reserved until the coming in of the master's reports, or the further order of this court."

From this decree an *appeal* was entered to this court.

The reasons for the decree were thus given by

THE CHANCELLOR. The right of the complainants generally to sustain this bill was questioned, on the ground that they had not made out a lien on the property of the bankrupt; and they referred their right to a period anterior to 1797, before which they allege their debts accrued.

In a former stage of this cause before me, the complainants' bill was demurred to, by some of the defendants, because some of the complainants, claiming to be creditors, had not proved or offered to prove their debts before the commissioners of bankruptcy; and this cause of demurrer was sustained because no privity was made out between the *assignee* and a *creditor* at large, who had no particular claim on the fund, that

IN ERROR.
•••••••
ALBANY,
March, 1808.

Sands and
others
v.
Codwise and
others.

he might, or might not, resort to it; but that until he did, it could not appear that he had an interest in its increase or application.

The same objection, at a subsequent hearing, was repeated, as to others of the complainants; but it was admitted in argument, and there was some evidence to that effect, that the complainants, without distinguishing which, and the amount of their different interests, were entitled to about 12,000 dollars under the commission.

The bill is of a somewhat peculiar complexion; for if the complainants have a right to maintain it, that right exists in them, both collectively and individually, though they profess to exert it for the benefit of all who shall ultimately appear entitled as creditors to share the general fund. How that fund was to be finally disposed of was made a subject for my consideration. It is sufficient for all equitable purposes, that some have entitled themselves as creditors; and that the competency of the others to become parties, has been tacitly admitted by the defendants, by their submitting to answer. And so far as respects the creditors proving themselves such under the commission, they may be well likened, as has been done in a recent case,* in the *English* court of chancery, to creditors on execution; for the commission is in the nature of an execution, as to all the creditors; and an effectual *lien* is created by the commission for their benefit.

* *Ex parte Stokes,* 7 Vesey, jun. 408.

It was objected that the bill, in its present form, could not be maintained, because the complainants could not be admitted to substitute themselves for the assignees. This objection did not appear to be much relied on; and I thought it could not admit of a doubt, that if they were interested in this fund, entrusted to the management of the assignee, and the latter neglected or refused to do the duties legally imposed on him, the creditors might pursue their interests, by filing a bill, at the peril of costs.

IN ERROR.

ALBANY,
March, 1808.

Sands and
others
v.
Codwise and
others.

Another objection, as to the mode of proving the bankruptcy and the circumstances constituting it, was taken by all the defendants, who have not admitted the bankruptcy.

The 56th section of the bankrupt law provided, that in all cases where the *assignees* should prosecute any debtor of the bankrupt, for any *debt, duty* or *demand*, the commission, or a certified copy thereof, and the assignment of the commissioners of the bankrupt's estate should be considered as conclusive evidence of the issuing of the commission, and of the person named therein, being a trader and bankrupt, at the time mentioned therein.

A certified copy of the commission of bankruptcy, and of the assignment of the bankrupt's estate, were given in evidence in the cause.

Two difficulties were stated; the one relating to the complainants; the other to the defendants.

It was urged that this section merely related to the assignee; but the assignee represents the interest of the creditors collectively, and whether the assignee sues himself, or, in consequence of his *laches* or *fault*, devolves the execution of some of his functions on his creditors, it ought not to vary the rule of evidence. The interest pursued is the same. The persons prosecuting for it are the same, under a different description. Their relation to the defendants is precisely the same, as to the objects pursued; and it appeared to me to be clearly within the reason of the statute, which was to prevent the debtors of the bankrupt from sheltering themselves under the subtilty of forms, to defeat a recovery.

A case was cited from *Douglas*,\* and another from the supreme court of this state;† but I did not consider them as having any analogy to the present.

\* *Doug.* 203.

† 1 *Caines*, 598.

IN ERROR.
••••••
ALBANY,
March, 1808.

Sands and
others
v.
Codwise and
others.

The other part of the objection respected the de‑ fendants.

Debts originate in express compact, or by the act and operation of law. Thus, at common law an action may as well be maintained on an *implied*, as an express con‑ tract. A *tort* may be waived, and resort be had to the *assumpsit*.

The words are *debt, duty* or *demand*. A debt may be created by the unjust appropriation of the chattel of another. The word *demand* is the most comprehensive in its import that technical language affords, as to debts or duties ; and for the purpose of promoting substantial justice, there can be no insurmountable restraint to ex‑ tend it so far as to embrace real estate, and to consider an inequitable appropriation of it, as creating an equita‑ ble demand, equivalent to a debt by implication of law. The word debtor seems to have been intended as a cor‑ relative to the words debt, duty or demand ; and hence, I was of opinion that it might well be maintained, that if the defendants had fraudulently possessed them‑ selves of the property of the bankrupt, they ought to be held debtors, by fraud, which no refinements or legal subtilties ought to screen from the justice of the court ; and whose powers are always exerted to defeat it. The general objections to maintaining the bill, appear‑ ed to me not sustained.

As to the merits, the case presented a complicated machinery, the precise relations of the different parts of which it was not easy to discover, or unfold, though its effects were too obvious to be mistaken.

A man reputed to be of large property, possessed of an ample real and personal estate, involved in debt be‑ yond his ability to pay, deliberately professes an intent to favour his friendly creditors, at the expense of others whom he deems unfriendly ; distributes by conveyances, to which the different members of his family are sub‑

scribing witnesses, a large proportion of his property among his children, and others, none of whom are creditors, and some of whom were confessedly incompetent to pay, unless enabled so to do, by the production of the subjects conveyed. These, however, instead of selling, leave him in the enjoyment of some of it, in the perception of the rents of other parts, continuing to exercise acts of ownership at different periods, indicating an absolute and unrestrained control, and leaving the debts of both classes of creditors unsatisfied.

This is the general aspect of the transaction. Its particular details require a more minute investigation.

The most material question between the parties does not arise between contending creditors as to preference. It is between creditors, and those who are alleged to hold by fraud.

Previous to the statute of bankruptcy, no law existed imposing it as a duty upon an insolvent to make an equal distribution of his estate among his creditors, unless on a process instituted at his own instance. The field of competition was therefore left open for the most vigilant and active, to secure preferences in the payment of *bona fide* debts, and if fairly acquired, they could not, unless affected by the usual badges of fraud, be defeated.

The obligation of the debtor sacredly to devote the whole of his property to the payment of his debts, was, however, from that circumstance, not the less imperative. The bankrupt law made no difference in this respect, but by enforcing the equality of satisfaction, in cases of bankruptcy, and furnishing in some cases, more determined tests of frauds practised in evasion of its provisions.

Thus it has been held, that the *English* statutes against fraud were merely in affirmance of the common law, and that without their aid, the suppression of the frauds,

*IN ERROR.*

ALBANY,
March, 1808.

Sands and
others
v.
Codwise and
others.

*IN ERROR.*
.......
ALBANY,
·March, 1808.
⌣ʷ~⌢⁓
Sands and
others
v.
Codwise and
others.
——————

thereby intended to be restrained, might have been ef-
fected.

The first conveyance, in order of time, is that of the
30th of *November*, 1796, from *Comfort Sands* to his
daughter *Sarah Maria Sands*, for a house and lot in
*Greenwich-street*. She having died subsequent to the
bankruptcy, the defendant, *Comfort Sands*, held the pro-
perty, as her heir.

The bill fixes the time of *Comfort Sands's* insolvency
to a period prior to 1797 ; and his answer limits it to the
latter end of that year.

The deed bears date the 22d day of *November*, 1796,
but it was made a question between the parties when it
was delivered. This was an essential ingredient in the
case, and both parties on the argument concurred in the
suggesting that it was a proper point for an issue. I
therefore directed an issue, in conformity to the wishes
of the parties.

The next transaction relates to the judgment and
execution of *H.* and *S. Johnson*. [Here his honour sta-
ted the facts.]

These answers made out a case, from the parties' own
showing, which rendered a recurrence to the deposi-
tions generally unnecessary ; but that of *John Swart-
wout*, a principal actor in this transaction, throws a great
degree of light on the subject, and explains some
points which the answers had not fully disclosed. He
states that he made the purchase, at the request of the
defendant, *Comfort Sands ;* that the inducement held
out to him was his indemnification against the responsi-
bilities he had incurred for the defendant, *Comfort Sands ;*
and that *H.* and *S. Johnson*, the plaintiffs in this suit,
on which the execution issued, would furnish the means
of paying for it ; that in the months of *February* and
*March*, 1801, the defendant, *Comfort Sands*, applied to the
witness and requested him to convey those houses and.

lots to the defendants, *Robert Sands* or *Lewis Sands;* that he hesitated respecting it, as it might involve him in responsibilities with the commissioners of bankruptcy; that *Comfort Sands* afterwards told him, that upon making such conveyance to his son *Lewis Sands*, he would give his note for the amount of the purchase-money, which note he would dispose of to some of his creditors, in satisfaction of his debts, and make a fair statement of it to the commissioners; that the said *Comfort Sands* had a considerable time before reimbursed him for the responsibilities he had incurred for him; that he made the conveyance to the defendant, *Lewis Sands*, and took his note payable to *bearer*, for the consideration money, and then redelivered the said note to *Comfort Sands.*

The sale by the sheriff to *John Swartwout*, was clearly in trust for the defendant, *Comfort Sands;* for from his answer it is to be collected that the sale was not intended to devest him of his property in the houses and lots, but that it was merely colourable; for though *H.* and *S. Johnson* had the debt alleged to be due to them, in the first instance, secured by judgment, they agreed to take their own notes; and the note of *Comfort Sands* for 2,500 dollars, which they had indorsed; and for which sum they must either have continued as indorsors, or have received it, on the credit of the maker only, in payment.

Besides, it could not have conduced to their effectual indemnity against the responsibilities they had incurred, unless the property had sold so much under value, as those responsibilities amounted to, or unless the fund to pay for it was to be furnished by the defendant, *Comfort Sands.*

These were strong indications of views inconsistent with the professed objects of the purchase, and of pre-

*IN ERROR.*

ALBANY,
March, 1808.

Sands and
others
v.
Codwise and
others.

IN ERROR.
·······
ALBANY,
March, 1808.

Sands and
others
v.
Codwise and
others.

meditated evasion, which forcibly corroborated the evi‑ dence of *John Swartwout*.

That deposition disclosed, that not a cent was paid on the first purchase to the sheriff; that the notes applied to its payment were provided by the defendant, *Comfort Sands*, with the approbation of *H.* and *S. Johnson;* that the whole transaction was suggested and ar‑ ranged, by the defendant, *Comfort Sands*, so as to be in perfect subserviency to his views; that though the re‑ sponsibilities for indemnifying *H.* and *S. Johnson*, which induced the sale, were satisfied, the property was held by *John Swartwout*, until the defendant, *Lewis Sands*, acquired a conveyance; and that when that con‑ veyance was made, no money was paid.

All these circumstances left no doubt, in my mind, that the defendant was the *cestuy que trust;* and that until the conveyance was made, *John Swartwout* held as his trus‑ tee. It followed, that the estate passed by the assign‑ ment of the bankrupt's estate, as the bankruptcy related to the 21st of *March*, 1801, and the conveyance to the defendant, *Lewis Sands*, was not made till the 27th of *April*, in that year.

When the explanations contained in the depositions of *John Swartwout* were taken into consideration, and com‑ pared with the answers of the defendants, no doubt could remain, but that this was a contrivance of the de‑ fendant to evade the provisions of the bankrupt law; that it originated in fraud, which accumulated in every subsequent step in the progress of these transactions.

The furniture and some other articles of personal pro‑ perty of the defendant, *Comfort Sands*, were sold by vir‑ tue of the same execution; and *Nathaniel Prime*, his son‑ in‑law, became the purchaser for 1,371 dols. and 38 cents; for which sum the defendant, *Comfort Sands*, says that *Nathaniel Prime* gave his note, and which he supposed he paid. *Prime*, in his answer, admits that he purchased

the furniture and two slaves, for which he either paid or
gave his note, which he afterwards paid ; and he denies that
either *Comfort Sands*, or any other person on his account,
furnished the money to pay for them, then, or at any
time since. They both concur in stating that *Comfort*
*Sands* has ever since possessed the furniture, some part
of which *Comfort Sands* says was carried over with him
to *Long Island*, during his confinement, and the remain-
der was left with him at his house in *Pine-street*, and
when he returned, he used it, and continued so to do, as
a personal accommodation to him from *Nathaniel Prime*,
who says, that it is his property, and that he merely lent
it to *Comfort Sands*, from motives of friendship. .

The only question arising on this subject was, whe-
ther leaving the furniture in the possession of *Comfort
Sands* was not within the purview of the bankrupt law ?

The 27th section of the bankrupt law* enacts, " that *\* L. U. S. v. 5.
p. 63.*
if any person shall become bankrupt, and at *such time*,
by consent of the owner, have in his or her posses-
sion and disposition any goods, whereof he or she
shall be reputed owner, and take upon him or her-
self the sale, alteration or disposition thereof, as owner,
the commissioners shall have power to assign the same,
for the benefit of the creditors, as fully as any other
part of the estate of the said bankrupt."

The statute of 21 *Jac*. I. c. 19. s. 11. contained a si- .
milar provision ; and the exposition it has received in
*England*, may be of use in the construction of our bank-
rupt law. As to all the intents in which the 27th section
of the latter, is material; in the present question, it is a
transcript of the former.

In the case of *Mace* and *Cadle*,† Lord *Mansfield*, in *† Cowp. 234.*
delivering the opinion of the court, lays it down, as de-
duced from the noted case of *Twine*,‡ that if a man *‡ 3 Co. Reb. 81.*
conveyed his own goods to another, and kept the posses-
sion, such possession would have been void, as fraudu-

IN ERROR.
.......
ALBANY,
March, 1808.

Sands and
others
v.
Codwise and
others.

lent, even before the statute of *frauds*. He adds, that it does not extend to the case of *factors* or *goldsmiths*, who have the possession of other men's goods, merely as trustees ; but the goods must be such as the party suffers the trader *to sell* as his own.

This opinion rather narrows the doctrine in *Twine's* case, as it required the exertion of the power to sell to constitute the possession fraudulent.

* 1 *Bos. & Pull.* 82.

The case of *Lingham* v. *Biggs,*\* is, in many leading points, analogous to the present. There the goods, consisting of furniture, were taken in execution ; valued by the sheriff ; a bill of sale made according to the valuation, to the plaintiff's brother, in *trust*, for the plaintiff ; articles of agreement entered into with the original owner, by which she stipulated to pay yearly 27*l.* for four years, and covenanted not to remove them without the plaintiff's consent. After the four years, the original owner became a bankrupt, and the goods were seized under the commission. The doctrine on this subject was fully examined. The distinction attempted to be taken between merchandise and furniture, was held not to be supported ; and that by the fair construction of the statute, the reputed ownership was the true test for determining the case ; for from that reputed ownership the false credit arises ; and from that the mischief intended to be guarded against ; the other terms of the section being incidental to reputed ownership. This appears to me a sound construction. The several cases cited in the argument were considered in that case ; and I thought the doctrine attempted to be deduced from them, as applicable to this case, explained and distinguished with great legal discernment ; and on the reasoning of that case, I was of opinion, that the furniture and other articles in possession of *Comfort Sands*, at the time of his bankruptcy, passed by the assignment.

*IN ERROR.*
•••••••
ALBANY,
March, 1808.

Sands and
others
v.
Codwise and
others.

It was urged, that the public sale, in this case, was favourable to its validity ; but whether a bankrupt sells directly, or employs circuitous means to effect the same object, cannot otherwise vary its complexion, than by furnishing additional motives for suspicion, from the extraordinary precautions resorted to. The judgment and execution appear to have been throughout, under the control of the defendant, *Comfort Sands*, and solely used to promote his views, and subserve his convenience ; and hence, even independent of the positive provisions of the bankrupt law, as to him, this might well be considered as part of the same system of conduct ; for from the intrinsic circumstances of the transaction, as described, in the concurrent answers and depositions of *John Swartwout*, it seems almost incredible, that while the real estate was thus disposed of, the furniture which both the defendants, *Comfort Sands* and *Nathaniel Prime*, agree in representing as having been purchased for the personal accommodation of *Comfort Sands*, should have been paid for by *Nathaniel Prime*, without some secret understanding, that it would be reimbursed on disclosing the object of the sale. Either this was the case, or the defendant, *Comfort Sands*, in violation of every honest feeling, extorted money from a person disposed to serve him from friendly motives, under a colourable pressure, contrived by his own devices, and to answer his fraudulent purposes, and applied the money thus obtained to his own use ; but in whatever point of light it may be placed it cannot support the sale.

The *Brooklyn* property was conveyed in *July*, 1798 ; of consequence, prior to the passing of the bankrupt law. [Here his honour recapitulated the pleadings and evidence relative to the disposition of this estate.]

The defendants, *Comfort* and *Henry Sands*, concur in stating, that *Henry Sands* had not the means of paying

*IN ERROR.*
·······
ALBANY,
March, 1808.

Sands and
others
v.
Codwise and
others.

for this estate, unless from the produce of the sales.  By
*Robert Lenox* he is described as a member of his father's
family, not worth much ; and by *Joshua Sands,* as either
a student at law, or an attorney recently admitted, hav-
ing no property of any considerable value.

The relation between the parties ; the inability of the
son to pay ; the useless precaution of preceding the con-
veyance, intended to be consummated in a few days, by
a contract ; the anticipation of a year's interest in the cal-
culation of the value ; the satisfying the money to be
paid by the terms of the contract, out of the rent of the
land conveyed, combined with the pretences under
which the conveyance was made, which the defendant,
*Comfort Sands,* alleged was to raise a fund which might
with greater facility be applied to the payment of his
debts ; and to enable the defendant, *Henry Sands,* by lay-
ing out the property into lots and selling them, to obtain
some compensation for his trouble in settling the mort-
gage, and the mode of management after the convey-
ance made, are calculated not only to excite, but to
make the most forcible impressions to confirm suspi-
cion.  When all these circumstances were reviewed in
detail and analyzed, each of them seemed to acquire ad-
ditional force from the dissection.

The relation of father and son, generally, involves an
intimate union of views and interests.  These may be
discordant, and not unfrequently are so ; but in this in-
stance, it is evident, that there was the most perfect coin-
cidence in these particulars.  One of the professed ob-
jects of the sale was to call into action, the activity and
discernment of the son, by parceling out and selling
the estate, and to give him a reward commensurate to
his exertions by those means ; and yet as soon as the
operation of selling commences, the father is admitted
to be better qualified to make proper dispositions, as be-
ing better acquainted with the relative value of the dif-

IN ERROR.

ALBANY,
March, 1808.

Sands and
others
v.
Codwise and
others.

ferent parts. The son had no funds to pay the sum paya-
ble beyond the amount of the mortgage, and in this re-
spect the matter is so arranged as entirely to exempt him
from paying any part of it; for the principal sum due on
the mortgage is stated to be 50,000 dollars; and a year's
interest was due on the mortgage on the first day of the
same month of *July*, in which the contract and convey-
ance were made. Another year's interest was anticipa-
ted; and the remaining 4,000 dollars was received out
of the produce of the estate thus professed to be sold,
upon the settlement of the accounts with *Joshua
Sands.*

The contract was another singular trait in this transac-
tion. It is dated on the 5th of *July*, four days before
it was intended the conveyance should be made. This,
in the situation of the parties, was worse than useless.
Every circumstance disclosed, showed that a perfect con-
fidence existed between them. *Comfort Sands* had no-
thing to acquire; and it was, by his own account, princi-
pally intended as a benevolence to *Henry Sands.* No
reciprocal but adverse interests, which it is generally the
purpose of contracts of this kind to reconcile and
secure: no precise rights or duties, as equivalent to
each other, to adjust: no difficulty in settling the terms
can even be presumed; and the time allotted for its con-
summation so short, as to leave little at hazard, from the
common contingencies of life.

This over caution is one of the settled *indicii* of
fraud. It evinces a diffidence in the rectitude of the
transaction, and excites a correspondent solicitude to
provide defences for its protection.

After the conveyance was executed, another series of
acts was presented, further developing the intent of the
parties. [Here his honour stated the acts and transac-
tions relative to the *Brooklyn* estate.]

IN ERROR.
........
ALBANY,
March, 1808.

Sands and
others
v.
Codwise and
others.

I forbear to enumerate such other instances as are susceptible of some explanation on the part of the defendants, reconcilable to their pretences; but those already intimated, show a general interference in the management of the property, and repeated and unequivocal acts of ownership.

These taken in connection with the reasons alleged for conveying the property, left no doubt, in my mind, that the whole of this business respecting the *Brooklyn* estate, was a *trick,* and not a *bona fide* conveyance.

I have not adverted to the value of the property. It is sufficient that it is of a value worth the pursuit of the creditors; and the contingent rise of value, if they have been unjustly deprived of it, is as much a positive loss to them, as if the value had remained stationary, and it had originally been so much undervalued.

It, however, appears, by the answers of *Comfort* and *Henry Sands,* that it was of greater value at the time of the conveyance, than the money professed to have been intended to be paid for it; and *Joshua Sands,* who, from his interest in and connection with the property, was, perhaps, the most competent to make a correct estimate, valued it at 75,000 dollars at the time of the conveyance. Other witnesses differ; but none value it at less than 60,000 dollars; which, whatever rule of calculation is adopted, will exceed the amount of the purchase-money considerably. For the 3,000 dollars were clearly an anticipation of a year's interest; and the 4,000 dollars, by the terms of the contract to be paid in cash, was so paid as not to require a cent to be advanced; and though several unforeseen circumstances might have contributed to enhance its value more rapidly than was calculated upon, it was, from the whole evidence exhibited in the cause, in a state of gradual increase, so as to yield a

moral certainty to the purchaser, of a handsome profit in a short period.

On a view of the whole subject, I was of opinion, that this conveyance, as against the creditors, must be deemed fraudulent and void. There were, however, circumstances disclosed, which rendered it convenient to consider it as a link in the chain of derivative title from *Comfort Sands.* The complainants were not disposed to question the partition, which, for aught that appears, was fairly and equally made. Sales were made to *bona fide* purchasers; and the purchase-money paid into the bank of *New-York,* in exoneration of the estate, generally; and those payments, the complainants conceded, were not to be disturbed; and others who might claim under it, and who were not parties to this suit, could not and ought not to be deprived of the rights they supposed themselves entitled to, without having an opportunity of defending them.

I, therefore, thought the better mode would be to direct a sale of the property not so disposed of, and to decree that *Comfort* and *Henry Sands* should join with the master in the conveyance; but it would have been less embarrassed in the detailed manner of selling calculated to make it most productive, if the title had been vested in the master, and by him transferred to the purchasers.

All the other transactions, relating to the estate of *Comfort Sands,* and between the same parties, must of course have received some taint from the fraud existing in this particular instance.

The intent expressed by *Comfort Sands* applied to all. The general circumstances of the parties continued the same throughout. Their answers as to the *bona fides* of the sale were falsified. The pretence of payment from the funds of *Henry Sands* was not maintained in any part.

IN ERROR.

ALBANY, March, 1808.

Sands and others v. Codwise and others.

IN ERROR.

ALBANY,
March, 1808.

Sands and
others
v.
Codwise and
others.

The estate of *Comfort Sands*, at *Schaticoke*, was the next object presented for consideration. [Here his honour stated the facts relative to this estate.]

If the conveyance in 1799, to *Elias Nixen*, was for a *bona fide* debt, I have already given my reasons for supposing it valid. The defendant, *Elias Nixen*, in his answer, shows an existing debt due to him from *Comfort Sands*, and that the conveyance by *Henry Sands* to him was made in satisfaction thereof. This answer is not impeached or disproved; it was before the passing of the bankrupt law; and of consequense there was no legal restraint on a fair preference.

Though *Peter Kemble*, the surviving partner of *Gouverneur & Kemble*, was made a party to the bill, neither the bill charged, nor the answer disclosed any circumstance respecting the satisfaction of their debt, by the conveyance from *Henry Sands* to them. It was therefore, as to him, not within the purview of the bill.

*Jesse Oakley* is not a party; but the exchange of the notes mentioned by the defendant, *Henry Sands*, for the bond by him executed to *Comfort Sands*, was expressly done to enable the latter to satisfy some of his creditors, in preference to others equally entitled, and in contemplation of bankruptcy, and therefore in evasion of the provisions of the bankrupt law.

This, therefore, was considered as void, as between *Comfort* and *Henry Sands*; and as *Henry Sands* was to be held as trustee for *Comfort Sands*, in the disposition of this property, he was required to account for the one-fifth of the purchase-money received on his contract for the 801 acres; and I was of opinion that he should be decreed to convey the lands undisposed of towards the satisfaction of the creditors mentioned in his answer. As the extent, situation, and amount of these could not be satisfactorily collected from the answer, it was referred to a master to ascertain those circumstances.

IN ERROR.
••••••
ALBANY,
March, 1808.

Sands and
others
v.
Codwise and
others.

The deposition of *George Tibbits* went to show the exercise of acts of ownership of *Comfort Sands*, as to the *Schaticoke* property, after the conveyance to *Henry;* but on the ground I have taken, in my view of the subject, it could not have much influence on the question.

The *Minisink* property was charged to have been conveyed by *Comfort Sands* to *Henry Sands*, for the consideration of 1,000 dollars. [Here his honour stated the facts relative to this estate.]

As far as those lands were destined to the satisfaction of existing debts, and were so applied, there could be no pretence for disturbing the title thus acquired. But the circumstances developed rendered it a proper subject to be referred to a master, to ascertain what proportion of those lands had been so applied, and when ; at what time the final settlement respecting them was made between the defendants *Comfort Sands* and *Henry Sands*, and whether the notes given to *Clayton*, and mentioned in the answer of *Henry Sands*, were satisfied, and how, and when. A report on these subjects was requisite to ascertain what proportion of the *Schaticoke* estate was to be considered as proper to be disposed of to the uses for which the complainants contend.

As to the lands in *Washington*, the bill stated that they were, in *November*, 1800, conveyed by the defendant, *Comfort Sands*, to his son, *Lewis Sands*, also a defendant, for 9,000 dollars.

The persons named in the answers as having received conveyances for parcels of the *Washington* property, were essential parties, but they have not been made parties ; as to the surplus, which appears to exceed 390 acres, the complainants were entitled to an account of it.

Another branch of the complainants' claim extended to the demand of *Comfort Sands* against the *United States.* [Here his honour stated the facts relative to this claim.]

*IN ERROR.*

ALBANY,
March, 1808.

Sands and
others
v.
Codwise and
others.

No depositions were taken as to this point. It was therefore to be determined on the bill and answers.

As far as related to this debt, I was of opinion that the bill could only be sustained on the ground that the defendant, *Isaac Kibbe*, had not urged the prosecution of the claim on the *United States* with due diligence; for if the defendant, *Nathaniel Prime*, had done every thing incumbent on him to obtain a liquidation of the demand; or if the defendant, *Isaac Kibbe*, had not grossly neglected his duty as assignee, the latter must of course, as the legal organ, constituted under the laws of the *United States* to manage the interests of the creditors, retain the power of managing it in his discretion, for the benefit of those creditors generally; for the right of the complainants to prosecute must originate in some palpable neglect or positive refusal of the assignee to perform a duty apparently in advancement of the trust, as to the precise subject in which the creditors collectively seek to establish their rights; which they must always do at the peril of costs.

It was not pretended that the court of chancery could change the assignee. All that could be expected was, to enable the parties in interest to enforce the rights which the assignee was disinclined, either from negligent or sinister motives, to give effect to.

The demand, in this instance, was not admitted by the government of the *United States* to be a claim on its justice. It is not a debt. Several other persons were originally interested in it, and the persons who claim under the assignment have added to the number interested in procuring the allowance of the claim. None of these persons, for aught that appeared, were dissatisfied. The fund had not been realized. Blended as the original interests of *Comfort Sands* were with those of others, it was difficult so to separate them as to attribute fault to the assignee; and I could not discover that spe-

IN ERROR.
......
ALBANY,
March, 1808.

Sands and
others
v.
Codwise and
others.

cies of neglect which would constitute a proper ground for my interference. Besides, the time elapsed between the period when *Comfort Sands* was declared a bankrupt, and the month of *August*, in the same year, the time the application was made to the assignee to prosecute the claim, afforded no opportunity to apply to congress on the occasion, as it was well known that congress wasnot in session between those days.

I was satisfied, from these views of the subject, that the bill, as to this point, could not be sustained.

The *French debt*, assigned to *Joseph Sands*, was in a somewhat similar situation; but the persons for whose benefit the assignment was intended were not parties, and therefore no effective decree could be pronounced.

Next, as to the *notes* delivered to *John Havens*. [Here his honour stated the allegations and facts relative to them.]

The circumstances stated as to him, as to the *gist* of the bill, are, that he offered to prove his debt before the commissioners; that *Comfort Sands*, *Nathaniel Prime*, or some other of the friends of the former, pending the examination before the commissioners, found means satisfactorily to secure him, and procure him to assign the debt in question to *Nathaniel Prime*, and that he afterwards offered to prove the debt.

I know of no legal restraint on the assignment of the debts of a bankrupt, not interfering with the general and equal distribution of his effects among his creditors. Like all other *choses in action* they are transferable, so as to entitle the assignee to the dividends of the original creditors. The circumstances stated afforded probable cause for suspecting improper practice on the subject; and as far as the bill operated as a bill of discovery, it was calculated to draw the necessary discoveries from the defendant. But though all the facts are admitted, they formed no ground for a decree against the defendant,

*IN ERROR.*
•••••••
· ALBANY,
March, 1808.

Sands and
others
v.
Codwise and
others.

*Havens;* for the charge against him as deduced from the facts is, that he assigned his debt, and of consequence the dividends to accrue therefrom, to *Nathaniel Prime.*

The answer of *Lewis Sands* was silent as to the whole of this transaction ; the making the notes for the consideration money for the *Washington* lots to *Comfort Sands* excepted.

There was no evidence to this point, and the whole rested upon the bill and answers, which did not make out a case for relief.

The complainants alleged, that the whole amount of the consideration money for the *Washington* property sold to *Lewis Sands,* was 9,000 dollars ; that *Lewis Sands* gave notes to the amount of 19,000 dollars. The inference attempted to be drawn was, that he has received more than he has disclosed. There was, however, no circumstance to be collected from the pleadings which would warrant that inference. The collusion charged was denied. The consideration for the notes was not deduced from the property of *Comfort Sands.* For aught that appears, they may have been made by *Lewis Sands* for another, or without any consideration ; but unless they were made in fraud of the creditors, there was no room to question them.

Whether these notes of *Lewis Sands* existed or not, was totally immaterial to the creditors of *Comfort Sands.* As they are stated to have been made after the bankruptcy of *Comfort Sands,* his indorsements are of course void ; and the only ground upon which it was contended they ought to be cancelled was their supposed connection with the property of *Comfort Sands.* This, however, has not been made out beyond the *Washington* estate ; and on that they cannot operate as a *lien.* Besides, the *strict duty* of the assignee, as to these debts, was rather that of resistance than prosecution ; and no

IN ERROR.
. . . . . . . .
ALBANY,
March, 1808.
Sands and others
v.
Codwise and others.

part of the interest confided to him could be withdrawn from the discretionary control with which he is legally invested, unless either *laches* or fault was made out against him ; or unless the *laches* should be of a nature to enable the court to impute to him neglect generally, as to the whole concern. But he has not been required to do any act to repel the claim.

The notes in the hands of the defendant, *Blagge*, are in the same situation. They are the notes of *Lewis Sands ;* and the complainants could not allege that the giving those notes was prejudicial to their interests, unless it appears that they detracted from the common fund. This, however, is not the case ; for it does not appear when they were made payable. If payable heretofore, it did not appear that any measures had been taken to fix *Comfort Sands* as the *indorsor.* If payable after the bankruptcy, as the notes never were delivered to the persons who were intended to be thereby benefited, and *Blagge's* interference cannot be resolved into an agency for them, they must, after the bankruptcy intervened, be legally inoperative ; for the consummation of the contract being suspended, and an event occurring destructive of the indorsor's power to bind himself, so as to affect the interest of his creditors, the capacity of clothing it with the legal essentials of consummation, were as effectually, to all legal purposes, lost, as in case of death. In either alternative, it would be useless to decree their delivery.

As to the houses and lots in *James-street*, conveyed to the defendant, *Robert Sands*, and by him to *John Jackson ;* both *Comfort* and *Robert Sands* concurred in stating them to have been fairly conveyed, before the bankruptcy of *Comfort Sands*, in consideration of 3,200 dollars, to *John Jackson*, who was not a party, but was examined as a witness, and whose testimony corroborated those answers, But a decisive point is, it was

IN ERROR.
........
ALBANY,
March, 1808.

Sands and
others
v.
Codwise and
others.

essential to make him a party to the suit, to bind his in-- terest, and he has not been made a party.

If the complainants succeeded in establishing their right to a portion of the common fund, which the as- signee had either despaired of, or neglected, it seemed reasonable that it should be converted into money under their management, as parties materially interested in making it as productive to the creditors generally, as possible ; and as to that point the assignee ought to have it in his power to execute the trust reposed in him by the bankrupt law, by giving to the fund thus recovered the destination prescribed by that law.

I thought, however, that for this purpose, it was not necessary to appoint a *receiver ;* a master being compe- tent to discharge the duty required, in order to give the decree effect.

There were many other questions necessary to be de- termined in the cause, before a final decree could be made. On all the other matters pursued by the bill, I was of opinion it ought to be dismissed ; but whether with or without costs, and how far the dismissal ought to extend, or how modified, it was not then necessary to determine. These were, therefore, reserved for further directions.

*Pendleton* and *T. A. Emmet,* for the appellants. The several conveyances from *Comfort Sands,* which are stated in the case, being for a valuable consideration, are good and valid, as between the parties. If they are void in regard to third persons, it must be either under the bankrupt law of the *United States,*[*] or the statute of this state for the prevention of frauds.[†]

This is a controversy between creditors and pur- chasers ; not between some creditors and other creditors, who have obtained an undue preference on the eve of, and in contemplation of bankruptcy. The 10th section

* *Laws of U. S.* vol. 5. p. 45.
† *Laws of N. Y.* vol. 1. p. 75. s. 2. 10 Sess. c. 44.

of the bankrupt law provides, " that in case of a *bona fide* purchase made from or under the bankrupt, for a valuable consideration, before the issuing of the commission, by any person having no knowledge, information or notice of any act of bankruptcy committed, such purchase shall not be invalidated or impeached." This just and equitable provision is not to be found in the *English* statutes of bankruptcy. Again, by one of the *English* statutes,[\*] all voluntary conveyances by the bankrupt are void as against the assignees; but the law of the *United States*[†] declares them void only if made " with intent to defraud creditors." If the conveyances of *Comfort Sands* to his children were for a good consideration, and without any intent to defraud his creditors, they must be valid.[‡] Any person, without notice of an act of bankruptcy, and before issuing the commission, may become a purchaser; for it would be not only unjust, but extremely inconvenient in a commercial country, if conveyances made *bona fide*, and without notice, could be overreached and avoided, by any secret act of bankruptcy.

Any man may convey his own goods to another for money, at any time before execution, though he may fear executions for debts, provided there be no secret trust between him and the vendee.[§]

A debtor may *bona fide* prefer one creditor to another.[¶]

The house and lot in *Pine-street* were sold for a valuable consideration, and before any act of bankruptcy. The execution was on a *bona fide* and valid judgment. The conveyance of the 27th *April*, 1801, to *Lewis Sands*, was for notes, which were, afterwards, paid away to creditors of *Comfort Sands*. The price was adequate. It was a sale at public auction, where there was a competition of bidders. Mere inadequacy of price is not, of itself, evidence of fraud; but is a circumstance of

IN ERROR.

. . . . . . .

ALBANY,
March, 1808.

Sands and
others
v.
Codwise and
others.

\* 1 *Jac.* . c. 15. s. 5.

† Sect. 17.

‡ 1 *Atk.* 93.

§ *Bac. Use of the Law,* 63. *Law Tracts,* 156. 13 *Viner,* 517. *Cowp.* 426. 1 *Atk.* 93. 10 *Ves.* jun. 138.
¶ 5 *Term Rep.* 285. *Prec. in Chanc.* 105. 13 *Vin.* 522. 2 *Anst.* 381. 1 *Ves.* jun 290.

IN ERROR.
••••••
ALBANY,
March, 1808.

Sands and
others
v.
Codwise and
others.

* 2 *Ves.* 518.
*Rob. on Fraud.*
*Conv.* 373. 170.

suspicion to be confirmed by other proofs.* The acts of ownership, when explained by the answers, are too trifling to furnish evidence of any secret trust for *Comfort Sands.*

It is admitted, that if the conveyances were after an act of bankruptcy, or notice of it, they were void. An act of bankruptcy cannot exist, by implication. The debtor must do some one of the acts enumerated in the statute; as lying in prison two months without giving bail; and the act of bankruptcy is not complete, until that time is expired. In *England* it is different, and has relation back to the day of arrest. The commissioners state that *Comfort Sands* began trading on the 21st *March.* But their declaration is not conclusive; the act does not intend that any such judicial power should be exercised by them. The production of the commission and assignment is evidence merely, that the party was a bankrupt when the commission issued. If the time was doubtful, there ought to have been an issue to ascertain the fact. But if the act was committed on the 21st *March;* yet if *Lewis Sands* had no notice of it, the conveyance to him would be valid.

The *Brooklyn* estate was conveyed to *Henry Sands,* prior to any act of bankruptcy; and the only question is, whether the conveyance was made with a view to defraud creditors. Where a bill calls upon a defendant to answer as to certain facts, it makes the answer evidence as to such facts. If the answer is to be taken as fact, then there was no fraud. The acts of *Comfort Sands,* said to be evidence of ownership, were done by him as agent for his son. He could act from a mere *parol* authority.† The answers expressly deny any fraud, and they are confirmed by the proofs in the cause.

†*Rob. on Fraud.*
*Conv.* 113.  9
*Ves.* jun. 251.

But supposing that the conveyances were not valid; yet the decree is erroneous in not directing the money paid by the grantees to be refunded; and the convey-

ances to stand as security, until the money was re-paid. A court of equity does not undertake to inflict a punishment; it merely affords compensation, or prevents fraud from producing any injury. Where a deed is valid between the parties, and fraudulent only as against creditors, the money paid by the purchaser is to be refunded.* The conveyances are set aside, on payment of the purchase-money and interest. The right of the creditors to set aside the conveyance, is in the nature of an equity of redemption, and the property is considered as a mortgage for the money paid.

Again, the decree directs *Comfort Sands* to account for the rents and profits of the *Brooklyn* estate from 1798, to the time of the bankruptcy. This is clearly erroneous and unjust. He can never be called to account for acts done prior to his bankruptcy. If he could be made accountable for one year, he might be for his whole previous life.

Again, *Henry Sands* is required to account for the rents and profits from the 4th *April*, 1800. It is true the bankrupt law was passed on that day; but that is no reason for making him accountable prior to any act of bankruptcy. He is also made accountable for the value of the lots sold, taken at the time of the decree, though sold several years before, when they were of much less value; and no allowance is made for taxes, or sums paid to *Comfort Sands*, prior to his bankruptcy.†

As to the *Greenwich* lots, conveyed to his daughters, it appears, that *Comfort Sands* was in 1796 and 1797, a man of large property. Where a man is not so much in debt as to render it probable, that his voluntary settlements and provisions are made with a view to defraud creditors, they will be valid.‡ The debtor should appear to be absolutely insolvent at the time, to render

IN ERROR.
. . . . . . .
ALBANY,
March, 1808.

Sands and
others
v.
Codwise and
others.

* 4 *Bro. C. C.*
112. 1 *Ves.* jun.
106. *Prec. in
Chan.* 80. 142.
1 *Ves.* 35. *Rob.
on Fraud. Conv.*
451. 658. 1 *Bro.
C. C.* 420. 8
*Ves.* jun. 283. 5
*Bro. C. C.* 156.
1 *Ves.* 518. 2
*Ves.* 217. 2 *Atk.*
296. 3 *Bl. Com.*
437. 2 *Bos. &
Pull.* 59.

† 9 *Mod.* 413.
3 *Atk.* 401. 2
*Atk.* 107.
1 *Ves.* jun. 161.

‡ *Rob. on Fraud.
Conv.* 17, 18, 19.
3 *Atk.* 410

IN ERROR.

ALBANY,
March, 1808.

Sands and
others
v.
Codwise and
others.

\* *Rob. on Fraud.
Conv.* 452. 2
*Ves.* 10. 2 *Atk.*
520. *Cro. Car.*
550. 2 *Bro. C.
C.* 90. *Cowp.*
434. 2 *Vern.* 44.
*Ca. temp. King,
C.* 78. 5 *Ves.* jun.
387. *Newland
on Cont.* 384.

such settlements for children, which are regarded with favour, void.\*

Again, the chancellor has thought proper to take the property out of the hands of the assignees of the bankrupt, and place it in the hands of a master. If the creditors were dissatisfied, they might appoint new assignees. To put the property into the hands of a master, creates useless expense, is a violation of the bankrupt law, and an infringement of the rights of a majority of the creditors.

*Riggs* and *Hoffman, contra.* The respondents appear as creditors suing for themselves, and for those creditors who will contribute to the expense. The other creditors are not to be considered as those who have, by their vigilance, obtained a satisfaction for their debts; but as combined with *Comfort Sands* in his attempt to defraud the respondents. This is not the case of a grantor applying to have conveyances set aside, in which the maxim is to be applied, that the party claiming equity must first do equity. The only grounds on which the bankruptcy of *Comfort Sands* can have any influence on the questions raised in the cause are,

1. That his assignee became a necessary party:

2. That if the conveyance of any of the property conveyed, independent of the bankrupt law, should be valid, the respondents, as standing in the place of the assignee, may have the benefit of the bankrupt laws:

3. As to bringing the money into court, and the distribution of the fund.

The cases which have been cited, if examined, will be found not to contain the doctrine to support which they were adduced, or are wholly inapplicable. An attentive examination of them will show, that *Lewis Sands* and *Henry Sands* can be entitled to no indemnity for their advances or responsibilities.

We contend that the conveyances by *Comfort Sands* are fraudulent and void, at common law, independent of any statute of bankruptcy. We shall first exhibit the conduct of *Comfort Sands* from the beginning of these transactions, which are throughout marked with that want of candour and honesty, as to leave no doubt of the fraud. [Here the counsel went into a minute examination of the facts.]

Conveyances of property with a fraudulent intent either pass no estate, or are void against the persons intended to be defrauded.* This is either by common law, or the statute of 13 *Eliz.* c. 5.† A *gratuitous* conveyance is always void, as against creditors.‡ The relationship between the grantor and grantee is a strong circumstance of suspicion ; and the possession of the grantor, and acts of ownership by him inconsistent with the pretended sale, are evidence of fraud.§

Again, in cases of alleged fraud, the answer of the party is not to be relied on as to any advances; but positive proof of the payment of the money is required. The mere responsibility is not sufficient.¶

Whoever comes into possession of an estate conveyed by fraud, must account for the rents and profits, when the conveyance is set aside.** The case of *Stackpole* v. *Davoren*†† is a very strong authority on this point.

As to the disposition of the fund, the court of chancery having jurisdiction of the cause, ought also to have the disposition of the property. It will not jeopardize it, by putting it in the hands of the assignee. It is more consistent with the dignity of the court, that it should be placed in the hands of a master, before whom all the creditors should exhibit their claims, that they may be contested or verified. In equity, all the creditors are equal, and no preference is to be given to judgment creditors, or such as have legal liens. The

*IN ERROR.*

ALBANY,
March, 1808.

Sands and
others
v.
Codwise and
others.

* *Rob. on Fraud.
Conv.* 591—596.
† 3 *Co.* 78. b.
*Dyer.* 294. b.
*Hob.* 72.
‡ *Rob. on Fraud,
Conv.* 450, 451,
452.

§ *Rob. ib.* 198,
199. 554. 558.
2 *Bulst.* 225.
1 *Fonb.* 202. and
*notes.*

¶ 3 *P. Wms.*
288. 2 *Ves.* 516.

** 2 *Rep. in Ch.*
30. *Langton* v.
*Tracy, Ridg-
way's Rep. temp.
Hard* v 176. 9
*Mod.* 83.
†† 1 *Bro. P. C*
9. 1 *Atk.* 13. 2
*Atk.* 107.

IN ERROR.
.......
ALBANY,
March, 1808.

Sands and
others
v.
Codwise and
others.

* Wyatt, 355,
356. 3 Atk. 564.

proper mode is to declare that the creditors should prove their debts before the master, and that they should be paid *pro rata*. A *receiver* may be appointed to receive the rents and profits, until the final end of the suit.*

YATES, J. In stating this case, for the purpose of giving an opinion, I shall confine myself to such facts as are immediately connected with the subjects, mentioned in the petition of appeal as exceptionable in the decree of his honour the chancellor, beyond which it is understood this court, according to an established rule, will not proceed in their adjudication, unless it be to extend and modify the decree, in favour of the respondents, according to such equitable rules as, in furtherance of justice, may be adjudged necessary ; and I shall have a due regard to such acts of the parties generally, as tend to explain or establish important facts, connected with the subjects which are immediately before the court for adjudication.

[Here his honour stated the facts.]

The first question will be as to the validity of the conveyances.

1. With regard to the deed for the houses and lots in *Pine* and *Cedar-streets.*

It is contended that a valid consideration was paid for this property, and that the proceeds have been properly disposed of; that the sale being public and by virtue of several executions of contending creditors, is sufficient to test the adequacy of the price.

No doubt can be entertained, that from the commencement of this transaction, *Comfort Sands* has been actuated by motives to continue this property under his control, particularly while Mr. *Swartwout* was connected with it. What he intended should be the ultimate disposition of it, remains to be inquired into. Whenever a person, in the embarrassed situation in which *Comfort Sands*

IN ERROR.
. . . . . . .
ALBANY,
March, 1808.

Sands and
others
v.
Codwise and
others.

appears to have been at this time, voluntarily executes a bond and warrant to enter judgment in favour of particular creditors, it must, from the nature of the transaction, create suspicion; and his conduct immediately becomes a proper subject for the most scrupulous investigation.

It is true, as has been remarked, that there are creditors who, in honour, and perhaps in conscience, ought to be preferred; and I shall not undertake to say, that *H.* and *S. Johnson*, together with *John Swartwout*, were not of this description. Had, therefore, this property been sold for its real value, to a *bona fide* purchaser, and the avails appropriated to discharge the debts and responsibilities assumed by those persons for *Comfort Sands*, it might perhaps be justified; but as they were satisfied by him in a different manner, this property virtually continued in his hands, and under his control; for it is admitted that *Swartwout* must be deemed the trustee of *Comfort Sands*, having at his instance and request purchased from the sheriff. Notwithstanding his situation as trustee, *Swartwout*, on being requested by *Comfort Sands* to convey to his son *Lewis*, hesitates to do it. The reluctance evinced by him shows his impression of the impropriety of the proposed conveyance. He hesitated certainly, not from a desire to retain the property, and convert it to his own use. It must have been from the suspicious aspect of the conduct of *C. Sands*, with which he, in this particular, was fully acquainted from the commencement. On being informed, however, that he would take a note for 11,000 dollars from *Lewis Sands*, and pass the same to his creditors, *Swartwout*, on the 27th *April*, 1801, conveyed this property to *Lewis Sands*, subject to a lien of 2,500 dollars, amounting in the whole, to 13,500 dollars. This is the period it passed out of the hands of *Comfort Sands*, if the conveyance executed by *John*

*IN ERROR.*
••••••
ALBANY,
March, 1808.

Sands and
others
v.
Codwise and
others.

*Swartwout* is to be considered valid; and as this, in fact, is a sale made by the father to the son at a time when his circumstances were much embarrassed, it must undergo a strict examination; for, independent of other circumstances, as observed by *Roberts, on Fraudulent Conveyances*, (p. 452.) " the very proximity of blood raises rather the idea of confederacy than affection."

It cannot reasonably be supposed, that *Lewis Sands* was not in possession of sufficient information respecting the circumstances of his father, to be convinced that he was at this time about becoming a bankrupt, and had already committed the act of bankruptcy upon which the commission was to be issued; and that a purchase made by him must be intended either for his immediate benefit, or for the ultimate advantage of his father. This is by no means an unwarrantable presumption, particularly when aided by the extraordinary situation of this property, that *John Swartwout* was the grantor, and his father the actual vendor, and exclusive manager of the business, both before and at the time of the sale, and who took his note in the first instance payable to bearer.

As to the amount of the consideration alleged to be paid for this property, I am not surprised that the true value could not be obtained at the sheriff's sale. On such occasions there will always exist a reluctance on the part of the purchaser of an estate owned by a person so extensively involved as *Comfort Sands* must have been at the time of the sale. This inadequacy of price appears evident by the testimony of *Swartwout*, the purchaser, in the first instance. He states the value at 16,000 dollars, making a difference of upwards of 2,000 dollars between the amount alleged to be paid by *Lewis Sands*, and his valuation. When the peculiar situation of the witness is considered, we cannot but place reliance on his judgment. He asserts that his interference

IN ERROR.
........
ALBANY,
March, 1808.
Sands and
others
v.
Codwise and
others.

was for his own indemnity, and consequently the value of this property must have been a subject of interest and inquiry to him. Besides, the other witnesses do not testify to the aggregate amount, but to the annual value. This is not a just rule. Many estates in this country sell for an amount, the lawful interest of which far exceeds the annual income. As this might, perhaps, be considered a mere matter of opinion, and that too much reliance ought not to be placed on it, I shall regard it only of importance when connected with the possession and acts of ownership. These are proved by his residing for some time in one of the houses, and by the testimony of *Isaac Pierson* and *John Gibson*, to whom, as owner, he let the house in *Cedar-street*, gave receipts in his own name for the rent, and ordered repairs to be made. Add to this, the extraordinary application of the pretended consideration-notes to creditors, without their apparent consent or acquiescence.

From all these acts, the conduct of the parties appears to be so strongly marked with collusion, to the injury of the creditors of *Comfort Sands*, that I have no hesitation in saying, that the deed from *John Swartwout* to *Lewis Sands*, for the houses and lots in *Pine* and *Cedar-street*, is void.

The principles upon which this deed is adjudged void, cannot admit of a reimbursement, or an indemnification to *Lewis Sands*, against the consequences of his own fraudulent acts. There can be no doubt of his knowledge of the whole business, and an understanding that he was to participate in the expected advantages to be secured by this iniquity. Not a cent has ever been paid by himself; and the notes in the hands of *John Blagge*, we have reason to believe, remain under the control of his father. No equitable claim can consequently exist for reimbursement or indemnity, especially in favour of a person deemed a party to the transaction.

*IN ERROR.*
•••••••
ALBANY,
March, 1808.

Sands and
others
v.
Codwise and
others.

I am, therefore, of opinion, that the decree in this respect is correct, being grounded on the fraudulent intentions of both *Comfort* and *Lewis Sands ;* and governed by principles different from those on which most of the cases adduced by the appellants, were decided, where deeds were avoided, or set aside on particular terms or conditions, founded on hard or unconscientious bargains.

It appears that the debt due to the bank of *New-York* of 56,000 dollars, without the addition of interest to accrue, was the true consideration to be paid for the *Brooklyn* property, and to which amount I shall confine my observations on the question respecting the adequacy of price.

This estate was held in common with *Joshua Sands,* the brother of *Comfort Sands,* who must be well acquainted with its value, and who considered it as worth, at the time of the sale, 75,000 dollars. A collector of taxes at *Brooklyn* states the value to be from 60,000 to 100,000 dollars. The average value, according to his estimation, would be 80,000 dollars.

I believe there is not one witness who puts it at less than 70,000 dollars ; so that on the most moderate valuation there existed a difference of 14,000 dollars, and by the testimony of *Joshua Sands* 19,000 dollars. This is a strong circumstance to presume the sale fraudulent.

The acts of ownership exercised over this property appear from the testimony of several witnesses. The allegation that those were the acts of an agent for *Henry Sands,* does not prevent the effect produced by the evidence on the validity of the whole transaction. No acts of ownership can be more striking than the receiving of rent, the payment of taxes, and, in some measure, managing and directing the sales and disposition of the property. Although it will not be questioned that an agent may be appointed by *parol ;* yet it is somewhat extraordinary there did not exist some written authority,

IN ERROR.

ALBANY,
March, 1808.

Sands and
others
v.
Codwise and
others.

particularly between parties who, at the time of the sale of this very property, evinced the greatest care and caution, by entering into written articles, when the deeds were to be executed a few days thereafter. No particular accounts as to this agency have ever been exhibited between them; and on other occasions different and extensive payments are alleged to have been made on an adjustment of accounts; but no books were produced. These are evidently mere pretences to cover improper designs. I cannot doubt, therefore, but that the sale of this property was fraudulent, and the deed consequently void.

It does not appear that any money has been paid, except out of the sales of this property, nor that *Henry Sands* can have a claim for reimbursement and indemnity, for the reasons already assigned, in considering the same subject, respecting the *Pine* and *Cedar-street* property. No doubt of a combination between *Comfort Sands* and *Henry Sands* can possibly exist. There evidently appears to be a deliberate system adopted by *Comfort Sands*, to put a large, if not the greatest, portion of his property into the hands of his children, for the avowed purpose of effecting an odious discrimination between his creditors, not disconnected with improper views and intentions to benefit himself, and wholly to defeat some of the creditors.

I shall next proceed to inquire into the account ordered of the rents and profits of this estate.

The decree in the court of chancery does not interfere with the purchasers from *Henry Sands*. Those persons are, perhaps, properly left in the undisturbed enjoyment of the rights obtained under that conveyance; but an account of the rents and profits of all the real estate conveyed by *Comfort Sands* to *Henry Sands* from the 9th day of *July*, 1798, is directed.

IN ERROR.
········
ALBANY,
March, 1808.

Sands and
others
v.
Godwise and
others.

The peculiar province of a court of equity is to detect and pursue fraudulent alienations, and arrest the property, particularly while in the hands of any of the parties to the transaction. This interference, however, must be grounded on an existing right in the party claiming redress, and can only take effect from the period when that right accrued in relation to the property. The title to such parts as are found in their hands must be considered as continuing in *Comfort Sands*, until the act of bankruptcy committed by him. I cannot, therefore, discover in what manner either *Comfort Sands* or *Henry Sands* can possibly be liable for the rents and profits of this estate, before that period.

It cannot be contended, that *Comfort Sands* had no right, before that time, to expend the avails or annual income, at his discretion, without responsibility to any one.

On a review, therefore, of the whole transaction between him and *Henry Sands*, and a recurrence to the reasons stated for the avoidance of the deed from him, the property being considered under his control and management, the demand on *Henry Sands* for the rents and profits previous to the acts of bankruptcy, ought not to be made. The decree ought, therefore, to be so modified, that no accounts of the rents and profits be required from either of them, until that event.

It is, undoubtedly, the duty of this court, in making up their opinion, to notice every incident connected with the cause, and, consequently, that part of the decree ordering those parties who are out of the jurisdiction of the court, to join in a conveyance with the master, ought to be so modified as to enable the court to enforce the decree, and secure an effectual remedy to the parties.

Upon the whole, my opinion is, that the decree of his honour the chancellor be affirmed, except as to the time when the accounts of the rents and profits in relation to the *Brooklyn* estate ought to commence.

VAN NESS, J. not having heard the argument of the cause, gave no opinion.

IN ERROR.
. . . . . . .
ALBANY,
March, 1808.

Sands and others
v.
Codwise and others.

SPENCER, J. was for affirming the decree below, except as to the person who was to receive and distribute the fund. He observed, that whenever an assignee declines to act, the creditors have a right to institute a suit for the benefit of all the creditors. By the law of the United States, the property of the bankrupt is vested in his assignees. The conveyances being adjudged fraudulent and void, the property remained in Comfort Sands, and by the bankrupt law became vested in his assignees. The conveyances were void at common law; but the court of chancery had a concurrent jurisdiction, it being a case of fraud; and the application to that court was merely for the purpose of avoiding the conveyances. It does not follow, that because the court of chancery had this cognisance of the cause, it is to take the property out of the hands of the assignee, and place it in the hands of a master. Having disincumbered the estate of the conveyances, the property remained as if those deeds had never existed; and being vested, by the law of the United States, in the assignees, no court can devest it.

KENT, Ch. J. The first and principal question in this cause arises upon two deeds of conveyance of the estate of Comfort Sands; the one from him to his son Henry for the Brooklyn estate, and the other from John Swartwout to Lewis Sands, for the houses and lots in Pine and Cedar-streets, in the city of New-York.

Comfort Sands stopped payment and became insolvent, in the year 1797. He had been very extensively engaged in trade, and at the time of his failure, he was possessed

IN ERROR.
·······
ALBANY,
March, 1808.
Sands and
others
v.
Codwise and
others.

of a large real and personal estate, and owed debts to a great amount.

Instead of calling his creditors together, and exhibiting to them a full and fair account of his debts and estate, according to the usual course with unfortunate merchants, he refused or neglected to exhibit any statement of his affairs, or to give them any satisfaction on the subject. He declared that he would prefer those creditors who did not sue him; and, just before the commission of bankruptcy had issued, he went so far as to declare in writing, that his hostile creditors would suffer for their conduct, and not get five per cent. for their demands.

With such a temper of mind, under his misfortunes, it was very natural that the general disposition of his estate to his children should destroy the confidence, and awaken the apprehensions of his creditors.

In *June*, 1798, he conveyed his *Schaticoke* estate; in *July*, 1798, his *Brooklyn* estate; and in *September*, 1799, his *Minisink* estate, to his son *Henry*. In *November*, 1798, his household furniture was seized under an execution issued in favour of two friendly creditors, and sold to *Nathaniel Prime*, his son-in-law, who left the same to continue in his possession and enjoyment. In *April*, 1801, his houses in *Pine* and *Cedar-streets* were, by arrangement with *Swartwout*, his trustee, conveyed to his son *Lewis*, and in *June* following he conveyed to the same son his lots in the city of *Washington*.

These sons, at the time of their respective purchases, were not men of reputed property, or by any means competent to pay for such great estates. His son *Henry*, in 1798, had just quitted his clerkship in an attorney's office, and was not in much business, and possessed little pecuniary credit. His son *Lewis* was also a member of his family in 1801, and of no reputed responsibility. These were the two sons to whom Mr. *Sands* thought

proper to convey real estate worth, according to his own valuation, nearly 100,000 dollars : and he declared before the commissioners of bankrupt, that these sales were made to prevent the operation of judgments, and to save his property from being sacrificed.

The general aspect of the business must at once excite in the mind a well-grounded distrust of the probity of the transactions ; and when we connect with it this confession of the party, the conclusion must press very strongly upon us that these sales were not fair and honest, but were fraudulently intended to secure a very considerable share of the property, for the future benefit of himself and his children.   A sale made, with the intent avowed by *C. Sands*, comes almost within the very words of the statute of 13 *Eliz.* which we have adopted, (*Laws of N. Y.* vol. 1. p. 75.) which declares, that every conveyance of lands made with the purpose or intent, to *delay*, *hinder*, or defraud creditors of their lawful actions and demands, shall be utterly void.

I shall first look more particularly into the circumstances attending the sale of the *Brooklyn* estate.

*Comfort Sands*, on the 5th day of *July*, 1798, entered into a formal written agreement with his son *Henry*, to convey to him the *Brooklyn* estate for 60,000 dollars ; and this agreement was carried into effect, in four days thereafter, by the deed of the 9th of *July*.   Such a studied formality in the negotiation, such a preliminary precaution without any apparent use or necessity, and that too between a father and a boy, just then emerged from school, and, as we may very well infer from the facts, still much dependent upon his father, and when the sale was avowedly intended by the father as a benefit to the son, is, to say the least of it, very extraordinary. It was out of the usual and natural course, as between such parties, and it therefore betrays contrivance, in order to give colour to the transaction.   The estate was

IN ERROR.
•••••••
ALBANY,
March, 1808.
Sands and
others
v.
Codwise and
others.

estimated at 60,000 dollars, which was the nominal consideration in the deed. To make up this sum, the mortgage to the bank of *New-York*, amounting, in principal and interest, to 53,000 dollars, was taken into the estimate, and another year's interest to the bank, to the amount of 3,000 dollars, was anticipated. The residue of the purchase-money, after deducting the mortgage upon the premises, with this anticipated interest, was 4,000 dollars, and that sum was to be paid to *Comfort Sands;* and he was authorised by *Henry* to receive it, and he afterwards did receive it, out of the rents and profits. The estate was thus sold for 3,000 dollars less than the reputed value in the deed; for the rents and profits for the year ensuing the sale, were a complete set-off against the interest which was to grow due in that year upon the mortgage. The consideration sum, as agreed upon by the parties at the time of the sale, is thus reduced to 57,000 dollars; and yet the parties contrived, without any justifiable or even plausible pretext, to give the consideration in the deed an artificial and nominal rise to 60,000 dollars.

But the reputed value in the deed was not the real value of the estate. It was the *minimum*, or least sum at which any person had ever computed its value. The value, in *July*, 1798, according to the weight of testimony, was, at least, 75,000 dollars. This was the positive testimony of *Joshua Sands*, who was perfectly acquainted with the property, and very competent to determine its value; and this was even below the average price, according to the opinion of the collector of taxes at *Brooklyn*. We may then very fairly consider, that the price of the *Brooklyn* estate, as estimated in the sale from *C. Sands* to his son, was at least 18,000 dollars below the real value. Here was then a great inadequacy of price.

But as the 4,000 dollars, coming to *Comfort Sands* upon this sale, were paid out of the rents and profits, the

son never paid a cent out of his own pocket, nor is it probable that the father ever looked to him as personally responsible. The sale has every appearance of a settled design to save the *residuum* of the estate, after the discharge of the mortgage to the bank, from the grasp of the creditors, and to reserve it either for the use of the father, or, as he himself expresses it, for the benefit of his son.

*IN ERROR.*

• • • • • • •

ALBANY,
March, 1808.

Sands and
others
v.
Codwise and
others.

These very striking circumstances attending the execution and consideration of the deed, were followed by acts of *Comfort Sands*, with the knowledge and privity of the son, which confirm the inference that the sale was intended as a mere cover to protect the estate, and defraud the creditors. He continued in the exercise of acts of ownership, by selling and leasing lots, and holding himself out to the world as the real owner. For the evidence of this fact, I need only refer generally to the testimony of the witnesses, and especially to the deed from *C. Sands* to *Annett*, in *March*, 1802, the agreement to sell lots to *Shelzel* in the same year, and the lease from *C. Sands* to *Britten*, in *April*, 1804; and none of the lots specified in these sales were included in the reconveyance from the son. *C. Sands* also continued his former attentions, and bestowed all his care upon the property. His son *Henry* did little or nothing. He made few (if any) contracts, and he took upon himself neither trouble nor responsibility.

I am aware of the allegation that *C. Sands* acted all this while as the agent of his son; but this allegation, although easily made, is not supported by proof. We have no evidence of any regular appointment or instructions from the son, or of any regular account kept and rendered by the father of his receipts and expenditures, as agent. The attempt to screen these constant, essential and conclusive acts of ownership, under the

IN ERROR.
........
ALBANY,
March, 1808.

Sands and
others
v.
Codwise and
others.

authority of an agent, is a shallow artifice, destitute even of the merit of plausibility.

The next subject of examination is the deed from *Swartwout* to *Lewis Sands*.

The *Pine* and *Cedar-streets* lots were sold at a sheriff's sale, in 1798, upon the judgment in favour of *H.* and *S. Johnson*; and *John Swartwout* purchased them for about 11,000 dollars. He became the purchaser, at the request of *C. Sands*; he says, that he was also induced to make the purchase for his own eventual indemnity, as a surety. *C. Sands* told *Swartwout*, at the time of making the request, that it would be the means of preventing a sacrifice of the property, and that the plaintiffs in the execution would enable him to pay the purchase-money to the sheriff. This was accordingly done by *C. Sands*, who put into his hands certain notes of the plaintiffs, which the sheriff received as payment. The sale to *Swartwout* was therefore made in consequence of an amicable arrangement between all parties; and it was manifestly a mere cover of the property for the benefit of *C. Sands*. *Swartwout* continued the nominal, and *C. Sands* the real owner, until *April*, 1801, when *Swartwout*, being exonerated from his responsibilities, did, at the request of *Comfort Sands*, convey the houses and lots to his son *Lewis Sands*, and took a note from *Lewis*, payable to bearer for the consideration sum, and delivered the same over to the father. If then we view this act in its true and genuine light, here was a sale of these lots by *Comfort Sands* to his son *Lewis*; and the question is, whether that sale was not a palpable fraud attempted to be committed upon the creditors.

The contrivance by which this property had, for the three preceding years, been covered under the name of *Swartwout*, prepares the mind to anticipate fraud in the sale to the son.

IN ERROR.
••••••
ALBANY,
March, 1808.

Sands and
others
v.
Codwise and
others.

It was stated, in the argument, that this deed was fraudulent and void under the late bankrupt law, and I incline strongly to this opinion. *C. Sands* had been in gaol upwards of 60 days, when the deed was executed; and, from the testimony of *John Jackson*, he was engaged in actual trade in the month of *March*, preceding the date of the deed. The commencement of his trading does not appear. *Jackson* proves only acts done, as a trader, in *March*. But from his former general character and business, as a merchant, and from those acts in *March*, may we not fairly presume, that in *February* preceding he was equally a trader? If so, *C. Sands* had clearly committed an act of bankruptcy, within the express words of the bankrupt law, at the time of the sale to *Lewis;* and can it be possible that *Lewis Sands* was a *bona fide* purchaser, without notice of that act of bankruptcy? He was then a member of his father's family; and could he have been ignorant that his father had been in *King's* county gaol, since *January* of that year; and could his father have carried on trade without his knowledge? The thing is to me incredible.

But admitting that the acts of bankruptcy mentioned by *John Jackson*, were the only solitary instances in which *Comfort Sands* assumed the character of a merchant while in gaol, another and a more serious question then arises, with what motive could *C. Sands* have engaged in the petty business of shipping 50 barrels of flour to *Europe?* Was it really for the sake of mercantile profit, and of renewing his connections and operations abroad? He was at that time completely insolvent, at war with his creditors, lost as to credit, and actually in prison. Was it not then rather for the purpose of becoming a trader, merely to bring himself within the purview of the bankrupt law, to which he soon after resorted? My mind is overcome by the irresistible pressure of circumstances which carry it to this conclusion; and those cir-

IN ERROR.

·······

ALBANY,
March, 1808.

Sands and
others
v.
Codwise and
others.

cumstances outweigh his assertion to the contrary. The question then is, was not this· sale to *Lewis Sands* made under a contemplation of bankruptcy, and with the privity of the son· as to that intention? The deed, in either alter-- native which I have mentioned, was void, as made *in fraudem legis*, and to defeat the equality and equity of the bankrupt law.

The validity of the deed does not, however, rest on the ground of constructive fraud,· by being made against the policy of the statute. The deed was fraudulent in fact, by being made under the influence of corrupt mó-- tives, to cheat creditors, and it was, therefore, void at com-- mon law, and as against the statute of *Elizabeth*, which· we have re-enacted, and which is only in ·affirmance of the principles of the common law.

The sale to *Lewis Sands* was for 11,000 dollars, and subject to a mortgage to *Jones & Haring* for 2,312 dol-- lars. The property, near three years before, was, in the · opinion of *Swartwout*, worth 16,000 dollars. The price was therefore inadequate, though not grossly so. What became of the large note for 11,000 dollars, does not appear, except from the answers of *Comfort* and *Lewis Sands;* and as the facts in those answers were put in issue, they ought to have been supported by proof. But assuming the account of the disposition of the note for 11,000 dollars to be correct, it then appears that the note was soon after exchanged, by arrangement between *Lewis* and his father, for several small notes, and most of them were deposited with *John Blagge*, an agent of *C. Sands*, where they remained (for any thing that appears to the contrary) unknown to the creditors, and where they re-- main still. *Blagge* says, that he was not the agent of the creditors for whose use these notes were alleged to have been lodged, nor was he acquainted with but one of them. It is exceedingly probable that *C. Sands* never gave any information to the creditors concerned, of the deposit

IN ERROR.
• • • • • •
ALBANY,
March, 1808.

Sands and
others
v.
Codwise and
others.

of those notes, because no application was made by the creditors to *Blagge* for the possession of them. The notes of *Lewis Sands*, which were not deposited with *Blagge*, but indorsed by *Comfort Sands*, and delivered over to the creditors, *Gracie* and *Heyer*, were attended with these singular circumstances. They fell due after the discharge of *Comfort Sands* under the bankrupt law, and yet he interferes in the first instance voluntarily, between the creditors and *Lewis Sands*, and assumes to pay them himself. Can there be more convincing testimony that the notes were considered by *Comfort Sands* as his proper debt, and that his son's name upon the paper was regarded by him as a matter of form? The history of these notes is alone sufficient to satisfy me of the fraudulent collusion between *Comfort Sands* and his son *Lewis*, and that the notes were never considered by either of the parties, as being given for a valuable consideration. *Comfort Sands*, at the time of this pretended sale, was in *King's* county gaol, and upon his discharge in *July*, he returned and occupied, as his own, the estate in question. He resided in the house in *Pine-street*, and he continued to let the house in *Cedar-street*, first to *Pierson*, and afterwards to *Gibson;* and he held himself out to those tenants, as the real owner. He speaks of acting all the time as agent for *Lewis Sands*, and of having settled with him; and he rests contented with this naked allegation, without the exhibition of a single document or voucher which might have afforded colour for his inference, or apology for his pretension. But we have a right to require some definite and specific evidence of his having acted and accounted, as the authorised agent of his son. His acts and his declarations were in the character of owner, not of agent; and the law will not allow him to assume in succession the one character or the other, as best suits his convenience. Such an ever-varying attitude is destructive to all sim-

*IN ERROR.*

ALBANY,
March, 1808.

Sands and
others
v.
Codwise and
others.

plicity and sincerity in dealing. *Quo teneam vultus mutantem Protea nodo?*

I forbear to dwell longer on this subject. The general character of the transactions before us, the conclusions which I have been obliged to draw, and the contrast between those conclusions and the answers of the parties to the deed, naturally give birth to painful reflections. I will therefore only observe, that for the reasons which have been suggested, I hold the two deeds to be grossly fraudulent, and absolutely void; and this brings me to consider the next question in this case, which was, whether the deeds ought not to stand as security to reimburse the sons for their advances, and to indemnify them against their outstanding paper.

The denial of this prayer appears to me to result necessarily from a decision against the validity of the deeds. On the ground of absolute fraud, the deeds were void to all intents and purposes. It is the same thing as if no such deeds had ever been executed. A fraudulent conveyance is no conveyance, as against the interest intended to be defrauded. This is the plain language and intelligent sense of the rule of the common law. (*Roberts on Fraudulent Conveyances*, 591. 596, 597. *Hob.* 72. *Humberton* v. *Hengil. Dyer*, 194. 294. 296. pl. 8. 3 *Co.* 78. b.) It is impossible that those deeds can be permitted to stand as a security, if they are to be adjudged void *ab initio.* If they have no lawful existence, it would be inconsistent and absurd to recognise them for any lawful purpose. I presume there is no instance to be met with of any reimbursement or indemnity afforded by a court of chancery to a *particeps criminis*, in a case of positive fraud. In *Smith* v. *Loader*, (*Prec. in Chan.* 80.) the party advancing money to an agent under a combination with him to cheat the principal, lost his whole security from the principal for the money actually advanced to his agent. It is fit and proper that

IN ERROR.
........
ALBANY,
March, 1808.

Sands and
others
v.
Codwise and
others.

this result should take place, as a contrary course might afford countenance to fraud by giving it a partial effect. It would not become a court of equity to take a single step to save harmless a party detected in a fraudulent combination to cheat. No right can be deduced from an act founded in actual fraud. *Nemo ex proprio dolo consequitur actionem.* The cases in which a deed is set aside on terms are not at all analogous to the one before us. They are usually those in which one of the parties comes in for help against a hard or unconscientious bargain, or when a contract is fraudulent by construction of law only, as being against the policy or provisions of some particular statute. When one of the parties to a bargain asks to be relieved, the rule very properly applies, that he who demands equity under his own contract, must give equity. (1 *Ch. Ca.* 97.) But the rule has no manner of application to the present case.

The refusal to aid the purchasers here by means of the deeds, will not only be proceeding upon plain and sound principles, but we can do it without any actual loss to the party; for what is there to refund to these sons? *Henry Sands* made no payments, except out of the proceeds of the *Brooklyn* estate; and as far as the sales of lots in that estate were made *bona fide*, and the monies paid in discharge of the mortgage to the bank, the decree does not disturb them. It only directs a sale of the property not so disposed of. Nor is there evidence that *Lewis Sands* ever paid a cent upon the notes, which he gave to his father upon the purchase of the lots in *New-York;* and he runs but very little hazard upon the outstanding notes. Most of them remain still under the control of his father, in the hands of *Blagge;* and he has his defence, if his father should attempt to enforce them at law; and as to the two notes which were delivered into the hands of the creditors, the pay-

*IN ERROR.*

• • • • • • •

ALBANY,
March, 1808.

Sands and
others
v.
Codwise and
others.

ment of them was expressly assumed by *Comfort Sands,* and the creditors were taught to look only to him.

Having thus examined the principal questions in the cause, I shall proceed briefly to consider some minor points which have been submitted.

The decree touching an account of the rents and profits is complained of; and I am of opinion, that upon this point it ought to receive some modification.

*Lewis Sands* is to account only for the rents and profits which he received subsequent to his deed; and so far the decree is undoubtedly correct. But in respect to the *Brooklyn* estate, the decree ought to be so modified as to make *Henry Sands* account only for the rents and profits received since the act of bankruptcy of his father, and that *Comfort Sands* be required to account only for the rents and profits subsequent to that event. The right of the complainants to call him to account cannot be extended beyond the time of his bankruptcy, because their title as creditors to an account accrued then, and not before. Chancery never decrees an account of rents and profits, but from the time that the right of the complainant accrued. (*Ridgw. Rep.* 180. 182, 183. 187.) In other respects the decree as to this estate is correct.

The only remaining point appealed from is respecting the disposition of the fund arising under the decree. The city lots are directed to be sold by a master, and *Lewis Sands* is directed to join with him in the conveyances to be made ; and out of the proceeds the master is first to satisfy the mortgage of *Jones* and *Haring*, and then bring the surplus money into court, to be distributed among the creditors, as should thereafter be directed. In like manner, the *Brooklyn* estate is ordered to be sold by a master ; and *Comfort* and *Henry Sands*, and all other proper parties, are to join in the conveyances, and the monies arising from the sales are to be also brought into court, to be distributed. The petition of appeal complains, that by

IN ERROR.
........
ALBANY,
March, 1808.

Sands and
others
v.
Codwise and
others.

this decree the management of this estate is taken out of the hands of the assignee. The original assignee, *Kibbe*, was a party to this suit; and in his answer he admits, that upon the application of the complainants, he had refused to prosecute the suit. This being the case, there can be no doubt that the creditors had a right to seek justice for themselves; for it was ruled in the court of chancery, so long ago as the year 1740, in the case of *Franklyn* and *Fern*, (2 *Eq. Ca. Abr.* 103.) that if the assignees refuse to bring a bill for the benefit of the bankrupt's estate, any creditor has a right to bring such bill. *Kibbe*, the assignee, in his answer, insists, however, that if the deeds should be set aside, the proceeds of these estates should be paid to him, to be distributed according to law. The contest then here is, who is to distribute the effects of the estate so recovered by the decree; and in this respect the petition of appeal has proceeded without any real foundation for complaint. The chancellor has made no decree, as to the distribution. He does by the decree expressly reserve that point to be determined when the money shall be brought into court; and there is no reason to presume that he does not mean to place the monies in the hands of the assignee for distribution. Having gone so far without the aid of the assignee, and against his will, I think the court of chancery was bound to render the remedy to the creditor effectual, by commanding possession of the fund. This power follows incidentally from the acknowledged jurisdiction which the court has in the first instance to sustain the bill. If the decree was to contain nothing more than the judgment of the court that the deeds were fraudulent and void, it would be a suit without relief; for execution is the fruit and end of the law. The assignee does not ask for the privilege of selling the estates, at his own time and pleasure. He only claims the proceeds for the purpose of distribution. I

*IN ERROR.*

ALBANY,
March, 1808.

Sands and
others
v.
Codwise and
others.

\* 2 *Johns. Rep.*
487.

see no objection to the decree in directing a sale of the estates. It is the consummation of the remedy sought for. A sale by the master is a judicial sale, and binds all the parties to the suit who have right or claim. It would accordingly bind the assignee; and though it has been suggested that there has been a change of the assignee, and this fact was admitted in the proceedings which took place in this cause the last winter;\* yet from those proceedings it appears that this change did not take place until subsequent to the decree; and the new assignee is equally bound by that decree with his predecessor, for he stands precisely in his place, and is subject to all his obligations.

I have now finished the consideration of all the points in the decree upon which the appeal was brought; and I think it is a rule of practice from which we ought not to depart, that when the petition of appeal recites specifically the parts of the decree of which it complains, and from which the appeal is made, the appellant is to be confined to those parts of the decree. I have not, therefore, examined the question made respecting the feigned issue; for that issue was no part of the decree appealed from; and it was very properly omitted, as the *chancellor* observed, in stating his reasons to this court, that both parties suggested the propriety of that issue.

The result of my opinion accordingly is, that, except as to the rents and profits of the *Brooklyn* estate, the decree, as appealed from, was in all other respects correct, and ought to be affirmed. But some modifications of the decree of affirmance, if any are to be made by this court, have been suggested by the respondent's counsel. As *Henry Sands* is out of the jurisdiction of the court, he ought not to be required to make any conveyance of the *Brooklyn* estate. This modification, I think, is necessary. The assignee may also, perhaps, be required to join in the conveyances, before the pro-

IN ERROR.
........
ALBANY,
March, 1808

Sands and
others
v.
Codwise and
others.

ceeds are paid over to him, though I do not believe that act requisite to perfect the title; and all costs and charges attending the suit in this court and in the court below, and for which the respondents might otherwise be responsible, ought to be previously deducted before they are paid over.

There were also some additions to the decree prayed for. One was respecting the balance, if any, of the demand of *Sands* against the *United States*, and assigned to *Prime*, and which would remain due after the claims under that assignment were satisfied; and also respecting the balance, if any, due from *H.* and *S. Johnson* to *Sands*. These balances ought undoubtedly to be ascertained, brought into court, and distributed in like manner as the other funds; and I see no reason why decrees to this effect ought not to be made, when the final decree comes to be completed in the court of chancery. The decree before us does not touch these questions; but the chancellor, in giving his opinion, seemed to intimate, that, as to these objects, the bill ought to be dismissed; and it becomes therefore proper, that an expression of the opinion of this court should be made, that these objects ought to be embraced in the final decree.

The rest of the court were also of opinion, that the decree below ought to be affirmed, except as to the part which directs the sale of the estates by the master; and it was thereupon ORDERED, ADJUDGED, and DECREED, as follows, to wit:

That the conveyance made by the sheriff of the city and county of *New-York*, to *John Swartwout*, mentioned in the pleadings in this cause, for the house and lots of ground, situate adjoining *Pine* and *Cedar-streets*, in the city of *New-York*; and also the deed in the said pleadings mentioned, for the said houses and lots of

IN ERROR.
••••••
ALBANY,
March, 1808.

Sands and
others
v.
Codwise and
others.

ground, from the said *John Swartwout*, to the appellant, *Lewis Sands*, having been made with intent to delay and defraud the respondents and others, the creditors of the appellant, *Comfort Sands*, are void, as against the said creditors : And it is further DECLARED and DECREED, that the said houses and lots of ground, adjoining *Pine* and *Cedar-streets* aforesaid, belonged to the appellant, *Comfort Sands*, at the time he became a bankrupt, as in the pleadings and proofs mentioned, and passed to, and became vested in the assignee of his estate and effects, as such bankrupt, subject to the mortgage thereon mentioned in the pleadings in this cause to the defendants, *Samuel Jones* and *John Haring*, in the same manner as though the said conveyances had not been made : And it is further ORDERED, DECREED, and ADJUDGED, that the said appellants, *Comfort Sands*, and *Lewis Sands*, respectively, account before one of the masters in chancery, for the rents and profits of the said houses and lots of ground, adjoining *Pine* and *Cedar-streets*, from the twenty-second day of *June*, 1801, which they the said *Comfort Sands* and *Lewis Sands*, have respectively received, or without wilful default might have received ; and that in taking such accounts, allowances for taxes, repairs and improvements, permanently useful, be made to the said *Comfort Sands* and *Lewis Sands ;* and the balance of the said accounts for the said rents and profits, when received, shall be placed in the hands of the assignee or assignees of the estate and effects of the said *Comfort Sands*, as such bankrupt : And this court doth further ORDER, ADJUDGE, and DECREE, that the deed of conveyance, made by the said *Comfort Sands* to the appellant, *Henry Sands*, (bearing date on or about the ninth day of *July*, in the year 1798,) mentioned in the pleadings, of the lands, tenements, hereditaments and real estate, situate at *Brooklyn*, in *King's* county, in the pleadings also mentioned ; and also the

deed, which appears by the proofs in the cause, for part of the said lands, tenements and hereditaments dated on or about the fifteenth day of *September*, in the year of our Lord, 1801, from the said *Henry Sands*, to the said *Comfort Sands*, having been made with intent to delay and defraud the respondents, and others, the creditors of the appellant, *Comfort Sands*, are void as against the said creditors : And it is further DECLARED and DECREED, that the said lands, tenements, hereditaments and real estate, situate at *Brooklyn* aforesaid, and which, on a partition thereof, between the said *Henry Sands*, as grantee of the said *Comfort Sands*, and *Joshua Sands*, as mentioned in the pleadings and proofs in this cause, were assigned, or fell to the share of the said *Henry Sands*, belonged to the said *Comfort Sands*, at the time he became a bankrupt as aforesaid ; and passed to, and became vested in, the assignee of his estate and effects, as such bankrupt, subject to the mortgage thereon, mentioned in the pleadings in this cause, to the president, directors and company of the bank of *New-York*.

And it is further ORDERED, ADJUDGED and DECREED, that the appellants, *Comfort Sands* and *Henry Sands*, respectively account, before one of the masters in chancery, for the rents and profits of the said last-mentioned lands, tenements, hereditaments and real estate, situate at *Brooklyn*, from the twenty-second day of *June*, in the year of our Lord, 1801, which they the said *Comfort Sands* and *Henry Sands*, have respectively received, or without wilful default might have received; and that in taking such accounts, allowances be made to the said *Comfort Sands* and *Henry Sands*, for taxes, repairs and improvements, permanently useful, and the balance of the accounts for the said last-mentioned rents and profits, when received, shall be placed in the hands of

IN ERROR.

ALBANY,
March, 1808.

Sands and
others
v.
Codwise and
others.

the assignee or assignees of the estate and effects of the said *Comfort Sands*, as such bankrupt :

And it is further ORDERED, ADJUDGED and DECREED, that out of the said estates, situate adjoining *Pine* and *Cedar-streets*, in the city of *New-York*, and at *Brooklyn*, or out of the proceeds of the sales thereof, or any part thereof, which has or may be brought into the court of chancery, by virtue of any decree or order thereof, or out of the said rents and profits, the respondents, in the first place. be reimbursed and satisfied all costs, charges and expenses, in and about the prosecution of the said suit, in the court of chancery, and the proceedings in this court, the amount whereof is to be ascertained by the court of chancery, which court is to give proper directions herein :

And it is further ORDERED, ADJUDGED and DECREED, that the said decree of the court of chancery, so far as the same is not hereby modified and altered, be, and the same is, hereby affirmed : And that the said decree so far as the same directs any conveyance to, or sale by, a master in chancery, of the said estates, or either of them, be, and the same is hereby reversed ; and that the record and proceedings brought here with this decree, be remitted to the court of chancery, to be executed according to law.

Judgment of affirmance.

END OF THE CASES IN ERROR.