# First National Bank of Tuskaloosa v. Kennedy.

### Bill in Equity by Judgment Creditor to subject Lands Fraudulently Conveyed by Debtor.

1. *Conveyance by insolvent debtor, or on consideration paid by him; validity as against creditors; burden of proof.*—A conveyance made by an insolvent or failing debtor, or made by another person on a consideration moving from him, is presumptively fraudulent as against his existing creditors, and devolves on the grantee the *onus* of proving a valuable and adequate consideration; but, when a creditor seeks to reach and subject lands conveyed by and between other members of the debtor's family, on the ground that the purchase-money was furnished by him, the *onus* of proving that fact is on the creditor.

2. *When fraudulent conveyance can not operate as security or indemnity.*—A transaction or conveyance which is tainted with actual fraud, as distinguished from fraud in law, is void *in toto* as against creditors, and can not be permitted to stand as security for the purpose of indemnifying or reimbursing any party who participated in the fraud, for any part of the consideration advanced by him.

3. *Conveyances held fraudulent in fact, on evidence.*—The land sought to be reached and subjected by creditors in this case belonged to the insolvent debtor when he went into bankruptcy in 1876, and was bought at the bankrupt sale by one of his sons, who had the title conveyed to his own wife; after which valuable improvements were erected on the land, and numerous conveyances were executed by and between different members of the debtor's family, during the ensuing ten years. The court states the facts connected with each of these conveyances, and in connection with the denials and inconsistent explanations of the answers, and holds, reversing the decree of the chancellor, (1) that the purchase-money paid at the bankrupt sale was furnished by the debtor himself, (2) that the improvements were paid for with money furnished by him, and (3) that the several conveyances were executed in recognition of his beneficial interest in the property, and for the purpose of putting and keeping it beyond the reach of creditors, and were therefore fraudulent in fact.

APPEAL from the Chancery Court of Tuskaloosa.

Heard before the Hon. S. K. McSPADDEN.

The bill in this case was filed on the 6th August, 1887, by the First National Bank of Tuskaloosa, as a judgment creditor of John S. Kennedy, against their said debtor and several of his sons and members of his family; and sought to subject to the satisfaction of complainant's judgment a certain tract of land which had once belonged to said Kennedy, and the beneficial interest in which, as the bill alleged, was yet in him. On final hearing, on pleadings and proof, the chancellor dismissed the bill, holding that the complainant had failed to establish

its right to relief; and this decree is here assigned as error. The opinion contains a full statement of the facts.

CABANISS & WEAKLEY, and F. S. MOODY, for appellant.

HARGROVE & VAN DE GRAAFF, and WOOD & WOOD, *contra.*

McCLELLAN, J.—The bill in this case seeks to subject certain land, and the proceeds of the sale of certain other land, the two parcels originally constituting one tract, to the satisfaction of a debt due from John S. Kennedy, one of the defendants, to the complainant, the First National Bank of Tuskaloosa. The land in question, prior to 1876, it is not controverted, belonged to John S. Kennedy. In October, 1875, he executed a mortgage on it to William Miller. In April, 1876, he executed a deed of trust on it to Frank S. Moody, as trustee. In July, 1876, he was adjudged a bankrupt, and said Moody and R. C. McLester were appointed his assignees in bankruptcy. In November, 1876, the said mortgagee, trustee and assignees united in the sale of the land at auction. At this sale John R. Kennedy, a son of John S., bid off the land, and subsequently had a deed made to his wife, Jodie M. Kennedy. The theory of the original bill is, that this purchase was made for John S. Kennedy, and that the money paid was his money, and furnished by him for the purpose. Some years afterwards, a handsome residence was built on the land, and expensively furnished. Complainant's theory is, that this was done at the instance, and for the benefit of John S. Kennedy, and that his money paid for it. The testimony having developed a tendency to show that the funds to pay for the land— about $3,200—were supplied by the firm of John R. Kennedy & Co., or rather out of the profits of all the members of that firm except Logan P. Kennedy; and that the funds with which the house was built and furnished, amounting to about $7,000, was in like manner supplied by the succeeding firm of Kennedy Brothers, or out of the profits of the members thereof, except said Logan P., the bill was amended at the hearing, so as to charge, in the alternative, that John S. was a member of the firm of John R. Kennedy & Co., and the purchase money paid by that firm was either wholly his, or in part furnished by him, and being as to the balance advanced by his sons, who were also members of the firm, was refunded to them by him; and further amended so as to charge, in the alternative, that John S. and the said Logan P. constituted the firm of Kennedy Brothers, and that the house was built and furnished with money which constituted in part the share of

John S. in the profits of that concern. The answers denied that John S. had any interest in either firm, and also that he furnished any money to purchase the land, or to build and furnish the house; and upon the hearing, the Chancellor found the issues presented in favor of the defendants, and dismissed the bill. This appeal brings his decree in that behalf under review.

On the issues thus presented to and passed on by the Chancellor, the burden of proof was on the complainants throughout. While it is a familiar doctrine in our jurisprudence, that a conveyance, either directly by a failing debtor, or made by another on a consideration moving from him, is presumptively fraudulent as against existing creditors, and devolves the *onus* of proving a valuable and adequate consideration on the grantee; it has no application here, where the primary and important inquiry is, whether, in point of fact, John S. Kennedy did supply the consideration paid for the land at the sale by the trustee, mortgagee, and assignees. The burden of proving this fact is upon the complainant, since, until it is established, it is manifestly immaterial what consideration the grantees paid, or from what source it was derived.—*Moog v. Farley*, 79 Ala. 246.

From, and including the first, to and including the last transaction with respect to the land—that is, from 1876 to 1887—there were as many as eight transfers of the title, or some interest in it; and it is not too much to say that circumstances of suspicion cluster about every step that was taken, and every paper that was executed in regard to it. At the very threshold, we are confronted by the inconsistent insistence, that while the land was purchased by John R. Kennedy & Co., only certain alleged members of that firm contributed to the purchase, or were to have any interest in it; and following close upon the heels of this development, is the further fact, inconsistent with both of the contentions, that the title was not taken in the names either of the firm, or of the alleged interested members thereof, but was vested in Jodie M. Kennedy, who confessedly never had, and was not to have any interest in it. Not only is this fact not explained satisfactorily, but the wholly abortive attempt at explanation—that because her father was to buy another part of the same tract sold at the same time, and give it to her absolutely, but failed to do so, she was made the naked trustee, wholly without interest, of the title to this land—makes "confusion worse confounded."

Again, while it is claimed that the purchase was made on account of John R. & Co., and that the purchase-money was paid by only a part of the alleged members of that firm, and

that the purpose of the transaction was to provide a home for their mother, the first step taken after the original purchase consisted in a mortgage executed by John R., or John R. & Co. and Jodie M., to secure a debt due by the firm to Clarke & Co. The purpose of the purchase, whether by John R. & Co., or certain members of that firm, and of the building and furnishing a house on the land by Kennedy Brothers, or certain alleged members of that firm—to provide a home for their mother—is attended, on the assumption that only the sons of John S. Kennedy were members of those firms, with elements of improbability. One of these is, that neither John R. & Co., nor Kennedy Bros., and certainly not those members of the firms, respectively, who, it is alleged, contributed to that end, were at any time in a condition, in justice to themselves, their own families, and their creditors, to donate the large sums of money which were used in the purchase and improvement of the land. Another is the fact, that soon after the original purchase, John S. removed with his wife, for whom it is said this handsome provision was being made, by men who could ill afford it, if at all, to their home in the city of Tuskaloosa, intending to claim it as a homestead, and continued to live there for four years; so that there appeared to be no necessity for the laudable sacrifices claimed to have been made by the Kennedy boys. Another infirmative consideration, which may as well be noted here as elsewhere, is, that while these sons of Mrs. Kennedy could not well afford to make any provision for their mother, and while it does not appear that she at the time stood in need of the provision proposed, and while they say their purpose was only to provide her a home, their donations did not stop with the purchase of a valuable tract of land for her, nor with the erection thereon of a handsome and costly residence, nor yet with the sumptuous furnishing of the same; but, in addition to all this, the books of Kennedy Bros. show that a large sum of money was donated by them to her, and stood on their books to her credit, a fact of which no explanation is attempted.

Furthermore, it is nowhere claimed by the defendants that the alleged members of the two firms, who contributed their profits to this donation, ever intended to do more than provide a home for their mother. If their purpose was to present her the fee of the land, this purpose is not foreshadowed in the idea of provision of a home, and it was certainly not effectuated by the simple and honest method of conveying the land to her. After her death, however, Jodie M. Kennedy, by appointment of John R. & Co., as the deed recites, conveyed the land to the heirs of Mary E. Kennedy, who happen to be also

the heirs apparent of John S. Kennedy, and among whom are three or more children of John S. and Mary E., who confessedly had not contrbuted in any way to this home for the latter. So that some of the children of Mary E., according to the theory of the defendants, starting out with no other purpose than to provide their mother with a home while she lived, and this though to all appearances she was already provided for in that respect, donated to her not only a home, but one far more costly than their ability justified, or her condition necessitated, and not only this home out of proportion to their means and her wants, but in addition thereto a large sum of money, which she does not appear to have used or needed; and in addition to all this, have put the capstone on their monumental munificence, by donating, after the death of their mother, full shares in this valuable property to their brother and sisters whose necessities are in no wise made to appear, and who contributed nothing whatever to the purchase or improvement of this estate.

What next presents itself in the tergiversation of the title to this land? Nothing has appeared in the case up to this point, as to providing a home for John S. The title is now in his heirs expectant. On the theory of the defense, it is wholly unnatural and unreasonable that this should be so, as we have seen. But, on the theory of the complainant, that it was the money of John S., and not of his sons, that paid for the property, and in view of the fact that John S. could not hold property in his own name, nothing is more reasonable, natural and matter of course, than that the title should be put in *his* heirs, to whom it would belong at his death. Just at this time John S. was on the eve of marrying again. His children did not know it, they say; but that is immaterial. In consideration of this marriage, he contracted to vest a life-estate in this property to his second wife. In order to carry out this contract, it was necessary to get the title out of the heirs of Mary E. Kennedy, so far as a life-estate was concerned; and accordingly they executed a deed of trust to certain of themselves—itself an unusual thing to do, and evidencing in some degree, at least, a desire to keep this whole matter "in the family"—and one of the trusts declared is, in effect, a life-estate in John S., "if he sees fit to claim the same"—another unusual condition, and tending in some degree, at least, to show that it was not thought well to invest any tangible, leviable interest in John S. Mary E. Kennedy had been dead more than a year before it was thought necessary to pass the title of the land out of Jodie M. into her heirs; and if John S. had no interest in the land, no reason is apparent why this should not have been done sooner, as

Mary E.'s heirs would very naturally have so desired.   But, if the land belonged to John S., there was no reason for Jodie M. to convey until this ante-nuptial contract of John S. made it necessary that the life-estate should be passed into him.   All these conveyances being made just before his marriage, is persuasive to show that they were all made at the instance of John S., and the fact that his sons did not know of his approaching marriage, only strengthens the idea that John S.'s relations to the property were such as that his children had to do his bidding in regard to it, even without knowing the reasons for his demands and directions.

The life-estate, thus passed into John S.'s second wife, was diverted from her heirs, she dying soon after, by her last will and testament.   But it is a little singular that she did not devise it to John S., from whom she received it, but did devise it to his heirs.   This singularity may be accounted for in the fact that the purpose of carving out the life-estate having been subserved, it was no longer either safe or desirable that it should remain outstanding.   The title, thus in its entirety re-invested in the heirs of Mary E. Kennedy, so remained until January, 1887, when the last shuffling of it took place.   The trustees in effect conveyed the whole tract of land to the Tuskaloosa Coal, Iron & Land Company, for three hundred, fifty-one and one-half shares of the capital stock of that company, and the re-conveyance back to them of that part of the land on which the dwelling was and is situated, and consisting of 12 ¾ lots, each fifty by one hundred and ninety feet in area. This conveyance back recites a consideration of $1,500, but no consideration was to be, or was in fact paid, but it was simply a passing of the title to that part of the land into and out of the Land Company, for no honest purpose that can be conceived of, the fact only serving to add another suspicious circumstance to the many that fleck the manipulation of the title to this land from 1876 to 1887, and to betray studied contrivance, it would seem, to cover up the real nature of all previous transactions, under the formality of meaningless muniments.

To all of these infirmative considerations are to be added others growing out of the attitude John S. has constantly sustained to the land, and which has seen no glint of change throughout the years that have passed, and the many transmutations of title to which we have referred.   His bare occupancy, except during the intervals from the death of his first wife to his second marriage, and from the death of his second wife to the filing of the bill, might be referable to the rights of his wives; but this is not true of the intervals referred to; and

certainly his acts of ownership, aside from mere possession, are not consistent at any time with the theory of the defense, that he had no interest in the property.

But all these facts and circumstances—and others which may be noted incidentally hereafter—of and by themselves, it may be said, are mere badges of fraud; and while they may excite suspicions of the good faith of the parties, yet they may still consist with the fact of payment in full for the land by the sons of John S., for the purpose set forth in the answers. And the burden of proof, as we have seen, not being on these grantees, they are not called upon to explain any of these many suspicious facts, unless the complainant adduces evidence going to show that the consideration paid actually moved from John S. Kennedy. All this is admitted; but, if there is independent evidence that John S. furnished the money to buy the land and to build the house, these circumstances then perform an important function in the corroboration of that independent proof. There is such evidence in this case, and to our minds it, supported by the considerations we have already advanced, is not of a character to be overborne by the testimony of the defendants which we find in this record.

It is, we think, satisfactorily shown, that the money which was paid for the land, and which constituted the consideration of the deed to Jodie M. Kennedy, executed in 1876, issued as profits out of the business of John R. Kennedy & Co.; and that the money which paid for the improvements afterwards put on the land, issued in like manner out of the profits of the business carried on in the name of Kennedy Brothers. The books, respectively, of these firms show that John S. Kennedy was a partner in each of them. The profit and loss accounts of each, and for each year of their existence, are wholly inexplicable upon any other theory, and utterly inconsistent with any other conclusion. He is there charged with net profits, and in some instances with a certain per cent. of the gross profits of these concerns, in the same manner as other members thereof. And while he and John R. and E. J. Kennedy all swear that he had no interest in the business of either of the firms, they make no effort to explain these accounts, but, on the contrary, when pressed on the subject, they confess their inability to explain them. Not only is this true, but no explanation whatever is attempted any where in the testimony, or in the arguments of counsel. We are, moreover, impressed in this connection by the failure of the defendants to examine L. P. Kennedy, who, it appears, has had charge of the books all the time, and who, it may reasonably be assumed, could explain this important testimony, so as to make it con-

sist with the present attitude of the defense, if any explanation were possible. We can not hesitate to give credence to these entries made by the defendants themselves, or for them, at a time when no litigation was pending, or probably in contemplation with respect to this land, in books which belonged to them, purporting to set forth truly these transactions among themselves, and which have been constantly in their custody, and open to inspection, but for the exigencies of this suit, only to them, in preference to the statements some of them now make as witnesses in this cause, when every inducement of interest drives them to a denial of the facts which their own records clearly evidence.

The precise interest John S. Kennedy had in the firms is immaterial, as also the specific amount of money belonging to him, which went to the purchase and improvement of the land. It may be that a part of the money which formed the consideration of the conveyance from Moody and others to Jodie M. Kennedy belonged to John R. and E. J. Kennedy; yet, if other appreciable part of it was John S. Kennedy's, and the whole was paid for the purpose of securing the land to John S., this was a fraud in fact, participated in by all of them; and the same would be true with respect to the money used to build and furnish the house, if supplied to any extent by others than John S. And the authorities all concur, that a transaction or conveyance which is actually fraudulent, as distinguished from fraud in law merely, is void *in toto*, and can not be permitted to stand for any purpose, whether of indemnity or reimbursement to those other than the debtor, whose funds have contributed to the consideration paid, or of cutting out and securing to them a part of the subject-matter proportionate to the amount they paid.—*Hyslop v. Codwise*, 4 John. 536; s. c., 4 Amer. Dec. 305; *Mackie v. Cairnes*, 15 Amer. Dec. 506; *United States v. Bradley*, 10 Peters, 343; *Ticknor v. Wiswall*, 9 Ala. 305; *Anderson v. Hooks, Ib.* 704; *Potter v. Gracie*, 58 Ala. 303; *Gordon v. Tweedy*, 71 Ala. 202; *Ruse v. Bromberg*, 88 Ala. 619.

It may be that the declaration of trust in favor of E. J. Kennedy was an effort to reimburse him for money advanced by him to the purchase or improvement of the land. If so, it must fail under the principle just announced; and if, as defendants insist, this was an advancement to him, it was an advancement by John S., and not by Mary E. Kennedy, and out of his property, and not out of hers; and his attitude is that of a donee with no rights against the creditors of John S.

It would seem, however, from the books of John R. Kennedy & Co., that the share of John S. in the net profits was, at

first, one-fourth, and afterwards one-third of the total; and from the books of Kennedy Brothers, that only he and L. P. Kennedy shared in the profits of that concern, and they equally. It is not pretended that L. P. Kennedy, who was a member of both firms, ever contributed to the purchase or improvement of the land; but it is sworn that the profits of all other members of each firm went either to buy the land, to build and furnish the house, or the credit of Mrs. Mary E. Kennedy. John S. being a partner, and holding from one-fourth to one-third in the firm of John R. & Co., and a one-half interest in the firm of Kennedy Bros., must have contributed from two-fifths to one-half to the fund which purchased the land, and all of the fund with which the house was built and furnished, *and which, in addition, made up the cash credit to his wife, Mary E. Kennedy.* This fully accounts for the otherwise most extraordinary fact, that while certain of the sons of John S. and Mary E. Kennedy, themselves in straightened circumstances, professing simply to provide a shelter for their mother, not only provided a large and handsomely furnished mansion for her, but in addition set aside to her use several thousand dollars. The money was not theirs, but their father's; the house was not provided by them for their mother, but by their father for himself and his wife. This most extraordinary fact, as well as the many other extraordinary facts to which we have adverted, as they appeared from the stand-point of the defense, becomes only a common badge of fraud, extraordinary only because of its great probative force in establishing actual fraud in all parties concerned, when it and they are viewed in the light thrown on all these transactions by the books of the defendants. Considered in that light, every fact developed in the case is made to fit in one consistent narrative of fraud, commencing in 1876, and continuing to the filing of this bill; and participated in by all the sons of John S. Kennedy, at one time or another, along the line of development.

If any further proof were needed that the beneficial ownership of this land has all along been, and is now in John S. Kennedy, it may be found in the casual admissions and remarks of some of his sons, and of himself, in which the land is referred to as his; in his acts importing, in greater or less degree, his ownership; in the evidence which tends to show that he attempted to cover other property in the name of his wife, and in other minor circumstances developed in evidence, which we will not take space to note here. Suffice it to say, that we are irresistibly driven to the conclusion, that the land belonged to John S.—that if any of his sons in fact contributed their means to its purchase or improvement in part,

[Robinson v. Cahalan.]

it was done with knowledge on their part of the purpose of hiding out the property from his creditors, and hence with participation on their part in that purpose; that if any of the present nominal holders of the title to the land, or of the Land Company stock for that part of the land bought by the company, did not participate in that purpose, they were such only as did not contribute to its purchase or improvement, and hence are mere volunteers; and finally, that the complainant is entitled to have the land nominally conveyed back to the trustees by said Land Company, and the stock in their hands, or the hands of any of the nominal beneficiaries, received for that part of the land which was conveyed to the company, sold for the satisfaction of its debt.

The decree of the chancellor is reversed, and a decree will be here entered in accordance with the foregoing opinion.

Reversed and rendered.